VALLEY FORGE CHRISTIAN COLLEGE *v.* AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, INC., ET AL.

No. 80–327.   Argued November 4, 1981—Decided January 12, 1982

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 490. STEVENS, J., filed a dissenting opinion, *post*, p. 513.

*C. Clark Hodgson, Jr.,* argued the cause and filed a brief for petitioner.

*Solicitor General Lee* argued the cause for the federal parties as respondents under this Court's Rule 19.6 in support of

petitioner. With him on the briefs were former *Solicitor General McCree, Deputy Solicitor General Geller, Deputy Solicitor General Shapiro, Leonard Schaitman,* and *Bruce Bagni.*

*Lee Boothby* argued the cause for respondents. With him on the brief was *Robert W. Nixon.*\*

JUSTICE REHNQUIST delivered the opinion of the Court.

I

Article IV, § 3, cl. 2, of the Constitution vests Congress with the "Power to dispose of and make all needful Rules and Regulations respecting the . . . Property belonging to the United States." Shortly after the termination of hostilities in the Second World War, Congress enacted the Federal Property and Administrative Services Act of 1949, 63 Stat. 377, as amended, 40 U. S. C. § 471 *et seq.* (1976 ed. and Supp. III). The Act was designed, in part, to provide "an economical and efficient system for . . . the disposal of surplus property." 63 Stat. 378, 40 U. S. C. § 471. In furtherance of this policy, federal agencies are directed to maintain adequate inventories of the property under their control and to identify excess property for transfer to other agencies able to use it. See 63 Stat. 384, 40 U. S. C. §§ 483(b), (c).[1] Property that has outlived its usefulness to the Federal Government is declared "surplus"[2] and may be transferred to pri-

---

\*Briefs of *amici curiae* urging affirmance were filed by *Nathan Z. Dershowitz* and *Marc D. Stern* for the American Jewish Congress et al.; and by *Leo Pfeffer* for the National Coalition for Public Education and Religious Liberty et al.

[1] The Act defines "excess property" as "property under the control of any Federal agency which is not required for its needs and the discharge of its responsibilities." 63 Stat. 378, 40 U. S. C. § 472(e).

[2] The Act defines "surplus property" as "any excess property not required for the needs and the discharge of the responsibilities of all Federal agencies, as determined by the Administrator [of General Services]." 63 Stat. 379, 40 U. S. C. § 472(g).

vate or other public entities. See generally 63 Stat. 385, as amended, 40 U. S. C. § 484.

The Act authorizes the Secretary of Health, Education, and Welfare (now the Secretary of Education[3]) to assume responsibility for disposing of surplus real property "for school, classroom, or other educational use." 63 Stat. 387, as amended, 40 U. S. C. § 484(k)(1). Subject to the disapproval of the Administrator of General Services, the Secretary may sell or lease the property to nonprofit, tax-exempt educational institutions for consideration that takes into account "any benefit which has accrued or may accrue to the United States" from the transferee's use of the property. 63 Stat. 387, 40 U. S. C. §§ 484(k)(1)(A), (C).[4] By regulation, the Secretary has provided for the computation of a "public benefit allowance," which discounts the transfer price of the property "on the basis of benefits to the United States from the use of such property for educational purposes." 34 CFR § 12.9(a) (1980).[5]

The property which spawned this litigation was acquired by the Department of the Army in 1942, as part of a larger tract of approximately 181 acres of land northwest of Philadelphia. The Army built on that land the Valley Forge General Hospital, and for 30 years thereafter, that hospital provided medical care for members of the Armed Forces. In April 1973, as part of a plan to reduce the number of military

---

[3] See 20 U. S. C. §§ 3411, 3441(a)(2)(P) (1976 ed., Supp. III).

[4] The property is to "be awarded to the applicant having a program of utilization which provides, in the opinion of the Department [of Education], the greatest public benefit." 34 CFR § 12.5 (1980). Applicants must be willing and able to assume immediate responsibility for the property and must demonstrate the financial capacity to implement the approved program of educational use. § 12.8(b).

[5] In calculating the public benefit allowance, the Secretary considers factors such as the applicant's educational accreditation, sponsorship of public service training, plans to introduce new instructional programs, commitment to student health and welfare, research, and service to the handicapped. 34 CFR pt. 12, Exh. A (1980).

installations in the United States, the Secretary of Defense proposed to close the hospital, and the General Services Administration declared it to be "surplus property."

The Department of Health, Education, and Welfare (HEW) eventually assumed responsibility for disposing of portions of the property, and in August 1976, it conveyed a 77-acre tract to petitioner, the Valley Forge Christian College.[6] The appraised value of the property at the time of conveyance was $577,500.[7] This appraised value was discounted, however, by the Secretary's computation of a 100% public benefit allowance, which permitted petitioner to acquire the property without making any financial payment for it. The deed from HEW conveyed the land in fee simple with certain conditions subsequent, which required petitioner to use the property for 30 years solely for the educational purposes described in petitioner's application. In that description, petitioner stated its intention to conduct "a program of education . . . meeting the accrediting standards of the State of Pennsylvania, The American Association of Bible Colleges, the Division of Education of the General Council of the Assemblies of God and the Veterans Administration."

Petitioner is a nonprofit educational institution operating under the supervision of a religious order known as the Assemblies of God. By its own description, petitioner's purpose is "to offer systematic training on the collegiate level to men and women for Christian service as either ministers or laymen." App. 34. Its degree programs reflect this orientation by providing courses of study "to train leaders for church related ministries." *Id.*, at 102. Faculty members

---

[6] The remaining property was conveyed to local school districts for educational purposes or set aside for park and recreational use. At the time of the conveyance, petitioner was known as the Northeast Bible College.

[7] The appraiser placed no value on the buildings and fixtures situated on the tract. The buildings had been constructed for use as an Army hospital and, in his view, the expense necessary to render them useful for other purposes would have offset the value of such an endeavor.

must "have been baptized in the Holy Spirit and be living consistent Christian lives," *id.*, at 37, and all members of the college administration must be affiliated with the Assemblies of God, *id.*, at 36. In its application for the 77-acre tract, petitioner represented that, if it obtained the property, it would make "additions to its offerings in the arts and humanities," and would strengthen its "psychology" and "counselling" courses to provide services in inner-city areas.

In September 1976, respondents Americans United for Separation of Church and State, Inc. (Americans United), and four of its employees, learned of the conveyance through a news release. Two months later, they brought suit in the United States District Court for the District of Columbia, later transferred to the Eastern District of Pennsylvania, to challenge the conveyance on the ground that it violated the Establishment Clause of the First Amendment.[8] See *id.*, at 10. In its amended complaint, Americans United described itself as a nonprofit organization composed of 90,000 "taxpayer members." The complaint asserted that each member "would be deprived of the fair and constitutional use of his (her) tax dollar for constitutional purposes in violation of his (her) rights under the First Amendment of the United States Constitution." *Ibid.* Respondents sought a declaration that the conveyance was null and void, and an order compelling petitioner to transfer the property back to the United States. *Id.*, at 12.

On petitioner's motion, the District Court granted summary judgment and dismissed the complaint. App. to Pet. for Cert. A42. The court found that respondents lacked standing to sue as taxpayers under *Flast* v. *Cohen*, 392 U. S. 83 (1968), and had "failed to allege that they have suffered any actual or concrete injury beyond a generalized grievance common to all taxpayers." App. to Pet. for Cert. A43.

---

[8] "Congress shall make no law respecting an establishment of religion . . . ."

Respondents appealed to the Court of Appeals for the Third Circuit, which reversed the judgment of the District Court by a divided vote. *Americans United* v. *U. S. Dept. of HEW*, 619 F. 2d 252 (1980). All members of the court agreed that respondents lacked standing as taxpayers to challenge the conveyance under *Flast* v. *Cohen, supra*, since that case extended standing to taxpayers *qua* taxpayers only to challenge congressional exercises of the power to tax and spend conferred by Art. I, § 8, of the Constitution, and this conveyance was authorized by legislation enacted under the authority of the Property Clause, Art. IV, § 3, cl. 2. Notwithstanding this significant factual difference from *Flast*, the majority of the Court of Appeals found that respondents had standing merely as "citizens," claiming " 'injury in fact' to their shared individuated right to a government that 'shall make no law respecting the establishment of religion.' " 619 F. 2d, at 261. In the majority's view, this "citizen standing" was sufficient to satisfy the "case or controversy" requirement of Art. III. One judge, perhaps sensing the doctrinal difficulties with the majority's extension of standing, wrote separately, expressing his view that standing was necessary to satisfy "the need for an available plaintiff," without whom "the Establishment Clause would be rendered virtually unenforceable" by the judiciary. *Id.*, at 267, 268. The dissenting judge expressed the view that respondents' allegations constituted a "generalized grievance . . . too abstract to satisfy the injury in fact component of standing." *Id.*, at 269. He therefore concluded that their standing to contest the transfer was barred by this Court's decisions in *Schlesinger* v. *Reservists Committee to Stop the War*, 418 U. S. 208 (1974), and *United States* v. *Richardson*, 418 U. S. 166 (1974). 619 F. 2d, at 270–271.

Because of the unusually broad and novel view of standing to litigate a substantive question in the federal courts adopted by the Court of Appeals, we granted certiorari, 450 U. S. 909 (1981), and we now reverse.

## II

Article III of the Constitution limits the "judicial power" of the United States to the resolution of "cases" and "controversies." The constitutional power of federal courts cannot be defined, and indeed has no substance, without reference to the necessity "to adjudge the legal rights of litigants in actual controversies." *Liverpool S.S. Co.* v. *Commissioners of Emigration,* 113 U. S. 33, 39 (1885). The requirements of Art. III are not satisfied merely because a party requests a court of the United States to declare its legal rights, and has couched that request for forms of relief historically associated with courts of law in terms that have a familiar ring to those trained in the legal process. The judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts. The power to declare the rights of individuals and to measure the authority of governments, this Court said 90 years ago, "is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy." *Chicago & Grand Trunk R. Co.* v. *Wellman,* 143 U. S. 339, 345 (1892). Otherwise, the power "is not judicial . . . in the sense in which judicial power is granted by the Constitution to the courts of the United States." *United States* v. *Ferreira,* 13 How. 40, 48 (1852).

As an incident to the elaboration of this bedrock requirement, this Court has always required that a litigant have "standing" to challenge the action sought to be adjudicated in the lawsuit. The term "standing" subsumes a blend of constitutional requirements and prudential considerations, see *Warth* v. *Seldin,* 422 U. S. 490, 498 (1975), and it has not always been clear in the opinions of this Court whether particular features of the "standing" requirement have been required by Art. III *ex proprio vigore,* or whether they are requirements that the Court itself has erected and which were not compelled by the language of the Constitution. See *Flast* v. *Cohen, supra,* at 97.

A recent line of decisions, however, has resolved that ambiguity, at least to the following extent: at an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S. 91, 99 (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon* v. *Eastern Kentucky Welfare Rights Org.*, 426 U. S. 26, 38, 41 (1976).[9]  In this manner does Art. III limit the federal judicial power "to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." *Flast* v. *Cohen*, 392 U. S., at 97.

The requirement of "actual injury redressable by the court," *Simon, supra*, at 39, serves several of the "implicit policies embodied in Article III," *Flast, supra*, at 96.  It tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action. The "standing" requirement serves other purposes.  Because it assures an actual factual setting in which the litigant asserts a claim of injury in fact, a court may decide the case with some confidence that its decision will not pave the way for lawsuits which have some, but not all, of the facts of the case actually decided by the court.

---

[9] See *Watt* v. *Energy Action Educational Foundation, ante*, at 161; *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 72 (1978); *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 261, 262 (1977); *Warth* v. *Seldin*, 422 U. S. 490, 499 (1975); *Schlesinger* v. *Reservists Committee to Stop the War*, 418 U. S. 208, 218, 220–221 (1974); *United States* v. *Richardson*, 418 U. S. 166, 179–180 (1974); *O'Shea* v. *Littleton*, 414 U. S. 488, 493 (1974); *Linda R. S.* v. *Richard D.*, 410 U. S. 614, 617–618 (1973).

The Art. III aspect of standing also reflects a due regard for the autonomy of those persons likely to be most directly affected by a judicial order. The federal courts have abjured appeals to their authority which would convert the judicial process into "no more than a vehicle for the vindication of the value interests of concerned bystanders." *United States* v. *SCRAP*, 412 U. S. 669, 687 (1973). Were the federal courts merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding, the concept of "standing" would be quite unnecessary. But the "cases and controversies" language of Art. III forecloses the conversion of courts of the United States into judicial versions of college debating forums. As we said in *Sierra Club* v. *Morton*, 405 U. S. 727, 740 (1972):

> "The requirement that a party seeking review must allege facts showing that he is himself adversely affected . . . does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome."

The exercise of judicial power, which can so profoundly affect the lives, liberty, and property of those to whom it extends, is therefore restricted to litigants who can show "injury in fact" resulting from the action which they seek to have the court adjudicate.

The exercise of the judicial power also affects relationships between the coequal arms of the National Government. The effect is, of course, most vivid when a federal court declares unconstitutional an act of the Legislative or Executive Branch. While the exercise of that "ultimate and supreme function," *Chicago & Grand Trunk R. Co.* v. *Wellman*, *supra*, at 345, is a formidable means of vindicating individual rights, when employed unwisely or unnecessarily it is also the ultimate threat to the continued effectiveness of the federal courts in performing that role. While the propriety of such action by a federal court has been recognized since

*Marbury* v. *Madison*, 1 Cranch 137 (1803), it has been recognized as a tool of last resort on the part of the federal judiciary throughout its nearly 200 years of existence:

> "[R]epeated and essentially head-on confrontations between the life-tenured branch and the representative branches of government will not, in the long run, be beneficial to either. The public confidence essential to the former and the vitality critical to the latter may well erode if we do not exercise self-restraint in the utilization of our power to negative the actions of the other branches." *United States* v. *Richardson*, 418 U. S., at 188 (POWELL, J., concurring).

Proper regard for the complex nature of our constitutional structure requires neither that the Judicial Branch shrink from a confrontation with the other two coequal branches of the Federal Government, nor that it hospitably accept for adjudication claims of constitutional violation by other branches of government where the claimant has not suffered cognizable injury. Thus, this Court has "refrain[ed] from passing upon the constitutionality of an act [of the representative branches] unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it." *Blair* v. *United States*, 250 U. S. 273, 279 (1919). The importance of this precondition should not be underestimated as a means of "defin[ing] the role assigned to the judiciary in a tripartite allocation of power." *Flast* v. *Cohen, supra,* at 95.

Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing. Thus, this Court has held that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth* v. *Seldin*, 422 U. S., at 499.[10] In addition, even when the plaintiff has al-

---

[10] See *Gladstone, Realtors* v. *Village of Bellwood,* 441 U. S. 91, 100 (1979); *Duke Power Co.* v. *Carolina Environmental Study Group, Inc., supra,* at 80; *Singleton* v. *Wulff,* 428 U. S. 106, 113–114 (1976).

leged redressable injury sufficient to meet the requirements of Art. III, the Court has refrained from adjudicating "abstract questions of wide public significance" which amount to "generalized grievances," pervasively shared and most appropriately addressed in the representative branches. *Id.*, at 499–500.[11] Finally, the Court has required that the plaintiff's complaint fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Orgs.* v. *Camp*, 397 U. S. 150, 153 (1970).[12]

Merely to articulate these principles is to demonstrate their close relationship to the policies reflected in the Art. III requirement of actual or threatened injury amenable to judicial remedy. But neither the counsels of prudence nor the policies implicit in the "case or controversy" requirement should be mistaken for the rigorous Art. III requirements themselves. Satisfaction of the former cannot substitute for a demonstration of "'distinct and palpable injury' . . . that is likely to be redressed if the requested relief is granted." *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S., at 100 (quoting *Warth* v. *Seldin, supra,* at 501). That requirement states a limitation on judicial power, not merely a factor to be balanced in the weighing of so-called "prudential" considerations.

We need not mince words when we say that the concept of "Art. III standing" has not been defined with complete consistency in all of the various cases decided by this Court which have discussed it, nor when we say that this very fact is probably proof that the concept cannot be reduced to a one-sentence or one-paragraph definition. But of one thing we may be sure: Those who do not possess Art. III standing may

---

[11] See *Gladstone, Realtors* v. *Village of Bellwood, supra,* at 100; *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S., at 80.

[12] See *Gladstone, Realtors* v. *Village of Bellwood, supra,* at 100, n. 6; *Simon* v. *Eastern Kentucky Welfare Rights Org.,* 426 U. S. 26, 39, n. 19 (1976).

not litigate as suitors in the courts of the United States.[13] Article III, which is every bit as important in its circumscription of the judicial power of the United States as in its granting of that power, is not merely a troublesome hurdle to be overcome if possible so as to reach the "merits" of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787, a charter which created a general government, provided for the interaction between that government and the governments of the several States, and was later amended so as to either enhance or limit its authority with respect to both States and individuals.

## III

The injury alleged by respondents in their amended complaint is the "depriv[ation] of the fair and constitutional use of [their] tax dollar." App. 10.[14] As a result, our discussion

---

[13] JUSTICE BRENNAN's dissent takes us to task for "tend[ing] merely to obfuscate, rather than inform, our understanding of the meaning of rights under the law." *Post*, at 490. Were this Court constituted to operate a national classroom on "the meaning of rights" for the benefit of interested litigants, this criticism would carry weight. The teaching of Art. III, however, is that constitutional adjudication is available only on terms prescribed by the Constitution, among which is the requirement of a plaintiff with standing to sue. The dissent asserts that this requirement "overrides no other provision of the Constitution," *post*, at 493, but just as surely the Art. III power of the federal courts does not wax and wane in harmony with a litigant's desire for a "hospitable forum," *post*, at 494. Article III obligates a federal court to act only when it is assured of the power to do so, that is, when it is called upon to resolve an actual case or controversy. Then, and only then, may it turn its attention to other constitutional provisions and presume to provide a forum for the adjudication of rights. See *Ashwander* v. *TVA*, 297 U. S. 288, 345 (1936) (Brandeis, J., concurring).

[14] Respondent Americans United has alleged no injury to itself as an organization, distinct from injury to its taxpayer members. As a result, its claim to standing can be no different from those of the members it seeks to represent. The question is whether "its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members

must begin with *Frothingham* v. *Mellon*, 262 U. S. 447 (1923) (decided with *Massachusetts* v. *Mellon*). In that action a taxpayer brought suit challenging the constitutionality of the Maternity Act of 1921, which provided federal funding to the States for the purpose of improving maternal and infant health. The injury she alleged consisted of the burden of taxation in support of an unconstitutional regime, which she characterized as a deprivation of property without due process. "Looking through forms of words to the substance of [the] complaint," the Court concluded that the only "injury" was the fact "that officials of the executive department of the government are executing and will execute an act of Congress asserted to be unconstitutional." *Id.*, at 488. Any tangible effect of the challenged statute on the plaintiff's tax burden was "remote, fluctuating and uncertain." *Id.*, at 487. In rejecting this as a cognizable injury sufficient to establish standing, the Court admonished:

> "The party who invokes the power [of judicial review] must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally. . . . Here the parties plaintiff have no such case." *Id.*, at 488.

Following the decision in *Frothingham*, the Court confirmed that the expenditure of public funds in an allegedly unconstitutional manner is not an injury sufficient to confer standing, even though the plaintiff contributes to the public coffers as a taxpayer. In *Doremus* v. *Board of Education*, 342 U. S. 429 (1952), plaintiffs brought suit as citizens and taxpayers, claiming that a New Jersey law which authorized public school teachers in the classroom to read passages from

---

themselves brought suit." *Warth* v. *Seldin*, 422 U. S., at 511. See *Simon* v. *Eastern Kentucky Welfare Rights Org.*, *supra*, at 40; *Sierra Club* v. *Morton*, 405 U. S. 727, 739–741 (1972).

the Bible violated the Establishment Clause of the First Amendment. The Court dismissed the appeal for lack of standing:

> "This Court has held that the interests of a taxpayer in the moneys of the federal treasury are too indeterminable, remote, uncertain and indirect to furnish a basis for an appeal to the preventive powers of the Court over their manner of expenditure. . . . Without disparaging the availability of the remedy by taxpayer's action to restrain unconstitutional acts which result in direct pecuniary injury, we reiterate what the Court said of a federal statute as equally true when a state Act is assailed: 'The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.'" *Id.*, at 433–434 (quoting *Frothingham* v. *Mellon, supra,* at 488) (citations omitted).

In short, the Court found that plaintiffs' grievance was "not a direct dollars-and-cents injury but is a religious difference." 342 U. S., at 434. A case or controversy did not exist, even though the "clash of interests [was] real and . . . strong." *Id.*, at 436 (Douglas, J., dissenting).

The Court again visited the problem of taxpayer standing in *Flast* v. *Cohen*, 392 U. S. 83 (1968). The taxpayer plaintiffs in *Flast* sought to enjoin the expenditure of federal funds under the Elementary and Secondary Education Act of 1965, which they alleged were being used to support religious schools in violation of the Establishment Clause. The Court developed a two-part test to determine whether the plaintiffs had standing to sue. First, because a taxpayer alleges injury only by virtue of his liability for taxes, the Court held that "a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitu-

tion." *Id.*, at 102. Second, the Court required the taxpayer to "show that the challenged enactment exceeds specific constitutional limitations upon the exercise of the taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8." *Id.*, at 102–103.

The plaintiffs in *Flast* satisfied this test because "[t]heir constitutional challenge [was] made to an exercise by Congress of its power under Art. I, § 8, to spend for the general welfare," *id.*, at 103, and because the Establishment Clause, on which plaintiffs' complaint rested, "operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power conferred by Art. I, § 8," *id.*, at 104. The Court distinguished *Frothingham* v. *Mellon*, *supra*, on the ground that Mrs. Frothingham had relied, not on a specific limitation on the power to tax and spend, but on a more general claim based on the Due Process Clause. 392 U. S., at 105. Thus, the Court reaffirmed that the "case or controversy" aspect of standing is unsatisfied "where a taxpayer seeks to employ a federal court as a forum in which to air his generalized grievances about the conduct of government or the allocation of power in the Federal System." *Id.*, at 106.

Unlike the plaintiffs in *Flast*, respondents fail the first prong of the test for taxpayer standing. Their claim is deficient in two respects. First, the source of their complaint is not a congressional action, but a decision by HEW to transfer a parcel of federal property.[15] *Flast* limited taxpayer standing to challenges directed "only [at] exercises of congressional power." *Id.*, at 102. See *Schlesinger* v. *Reservists Committee to Stop the War*, 418 U. S., at 228 (denying standing because the taxpayer plaintiffs "did not challenge an enactment under Art. I, § 8, but rather the action of the Executive Branch").

---

[15] Respondents do not challenge the constitutionality of the Federal Property and Administrative Services Act itself, but rather a particular Executive Branch action arguably authorized by the Act.

Second, and perhaps redundantly, the property transfer about which respondents complain was not an exercise of authority conferred by the Taxing and Spending Clause of Art. I, § 8. The authorizing legislation, the Federal Property and Administrative Services Act of 1949, was an evident exercise of Congress' power under the Property Clause, Art. IV, § 3, cl. 2.[16] Respondents do not dispute this conclusion, see Brief for Respondents Americans United et al. 10, and it is decisive of any claim of taxpayer standing under the *Flast* precedent.[17]

---

[16] The Act was designed "to simplify the procurement, utilization, and disposal of Government property" in order to achieve an "efficient, businesslike system of property management." S. Rep. No. 475, 81st Cong., 1st Sess., 1 (1949). See H. R. Rep. No. 670, 81st Cong., 1st Sess., 1–2 (1949). Among the central purposes of the Act was the "maximum utilization of property already owned by the Government and minimum purchasing of new property." S. Rep. No. 475, *supra*, at 4. Congress recognized, however, that from time to time certain property would become surplus to the Government, and in particular, property acquired by the military to meet wartime contingencies. Congress provided a means of disposing of this property to meet well-recognized public priorities, including education. See S. Rep. No. 475, *supra*, at 4–5; H. R. Rep. No. 670, *supra*, at 5–6.

[17] Although not necessary to our decision, we note that any connection between the challenged property transfer and respondents' tax burden is at best speculative and at worst nonexistent. Although public funds were expended to establish the Valley Forge General Hospital, the land was acquired and the facilities constructed 30 years prior to the challenged transfer. Respondents do not challenge this expenditure, and we do not immediately perceive how such a challenge might now be raised. Nor do respondents dispute the Government's conclusion that the property has become useless for federal purposes and ought to be disposed of in some productive manner. In fact, respondents' only objection is that the Government did not receive adequate consideration for the transfer, because petitioner's use of the property will not confer a public benefit. See Brief for Respondents Americans United et al. 13. Assuming, *arguendo*, that this proposition is true, an assumption by no means clear, there is no basis for believing that a transfer to a different purchaser would have added to Government receipts. As the Government argues, "the ultimate purchaser would, in all likelihood, have been another non-profit institution or local school district rather than a purchaser for cash." Brief for Federal Respondents 30. Moreover, each year of delay in disposing of the prop-

Any doubt that once might have existed concerning the rigor with which the *Flast* exception to the *Frothingham* principle ought to be applied should have been erased by this Court's recent decisions in *United States* v. *Richardson*, 418 U. S. 166 (1974), and *Schlesinger* v. *Reservists Committee to Stop the War, supra.* In *Richardson*, the question was whether the plaintiff had standing as a federal taxpayer to argue that legislation which permitted the Central Intelligence Agency to withhold from the public detailed information about its expenditures violated the Accounts Clause of the Constitution.[18] We rejected plaintiff's claim of standing because "his challenge [was] not addressed to the taxing or spending power, but to the statutes regulating the CIA." 418 U. S., at 175. The "mere recital" of those claims "demonstrate[d] how far he [fell] short of the standing criteria of *Flast* and how neatly he [fell] within the *Frothingham* holding left undisturbed." *Id.*, at 174–175.

The claim in *Schlesinger* was marred by the same deficiency. Plaintiffs in that case argued that the Incompatibility Clause of Art. I[19] prevented certain Members of Congress from holding commissions in the Armed Forces Reserve. We summarily rejected their assertion of standing as taxpayers because they "did not challenge an enactment under Art. I, § 8, but rather the action of the Executive Branch in permitting Members of Congress to maintain their Reserve status." 418 U. S., at 228 (footnote omitted).

erty *depleted* the Treasury by the amounts necessary to maintain a facility that had lost its value to the Government. Even if respondents had brought their claim within the outer limits of *Flast*, therefore, they still would have encountered serious difficulty in establishing that they "personally would benefit in a tangible way from the court's intervention." *Warth* v. *Seldin*, 422 U. S., at 508.

[18] U. S. Const., Art. I, § 9, cl. 7 ("[A]nd a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time").

[19] U. S. Const., Art. I, § 6, cl. 2 ("[N]o Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office").

Respondents, therefore, are plainly without standing to sue as taxpayers. The Court of Appeals apparently reached the same conclusion. It remains to be seen whether respondents have alleged any other basis for standing to bring this suit.

## IV

Although the Court of Appeals properly doubted respondents' ability to establish standing solely on the basis of their taxpayer status, it considered their allegations of taxpayer injury to be "essentially an assumed role." 619 F. 2d, at 261.

> "Plaintiffs have no reason to expect, nor perhaps do they care about, any personal tax saving that might result should they prevail. The crux of the interest at stake, the plaintiffs argue, is found in the Establishment Clause, not in the supposed loss of money as such. As a matter of primary identity, therefore, the plaintiffs are not so much taxpayers as separationists . . . ." *Ibid.*

In the court's view, respondents had established standing by virtue of an "'injury in fact' to their shared individuated right to a government that 'shall make no law respecting the establishment of religion.'" *Ibid.* The court distinguished this "injury" from "the question of 'citizen standing' as such." *Id.*, at 262. Although citizens generally could not establish standing simply by claiming an interest in governmental observance of the Constitution, respondents had "set forth instead a particular and concrete injury" to a "personal constitutional right." *Id.*, at 265.

The Court of Appeals was surely correct in recognizing that the Art. III requirements of standing are not satisfied by "the abstract injury in nonobservance of the Constitution asserted by . . . citizens." *Schlesinger* v. *Reservists Committee to Stop the War*, 418 U. S., at 223, n. 13. This Court repeatedly has rejected claims of standing predicated on "'the right, possessed by every citizen, to require that the

Government be administered according to law . . . .' *Fairchild* v. *Hughes*, 258 U. S. 126, 129 [1922]." *Baker* v. *Carr*, 369 U. S. 186, 208 (1962). See *Schlesinger* v. *Reservists Committee to Stop the War, supra,* at 216–222; *Laird* v. *Tatum,* 408 U. S. 1 (1972); *Ex parte Levitt,* 302 U. S. 633 (1937). Such claims amount to little more than attempts "to employ a federal court as a forum in which to air . . . generalized grievances about the conduct of government." *Flast* v. *Cohen,* 392 U. S., at 106.

In finding that respondents had alleged something more than "the generalized interest of all citizens in constitutional governance," *Schlesinger, supra,* at 217, the Court of Appeals relied on factual differences which we do not think amount to legal distinctions. The court decided that respondents' claim differed from those in *Schlesinger* and *Richardson,* which were predicated, respectively, on the Incompatibility and Accounts Clauses, because "it is at the very least arguable that the Establishment Clause creates in each citizen a 'personal constitutional right' to a government that does not establish religion." 619 F. 2d, at 265 (footnote omitted). The court found it unnecessary to determine whether this "arguable" proposition was correct, since it judged the mere allegation of a legal right sufficient to confer standing.

This reasoning process merely disguises, we think with a rather thin veil, the inconsistency of the court's results with our decisions in *Schlesinger* and *Richardson.* The plaintiffs in those cases plainly asserted a "personal right" to have the Government act in accordance with their views of the Constitution; indeed, we see no barrier to the *assertion* of such claims with respect to any constitutional provision. But assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning.

Nor can *Schlesinger* and *Richardson* be distinguished on the ground that the Incompatibility and Accounts Clauses are in some way less "fundamental" than the Establishment Clause. Each establishes a norm of conduct which the Federal Government is bound to honor—to no greater or lesser extent than any other inscribed in the Constitution. To the extent the Court of Appeals relied on a view of standing under which the Art. III burdens diminish as the "importance" of the claim on the merits increases, we reject that notion. The requirement of standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Flast* v. *Cohen, supra,* at 99. Moreover, we know of no principled basis on which to create a hierarchy of constitutional values or a complementary "sliding scale" of standing which might permit respondents to invoke the judicial power of the United States.[20]

---

[20] JUSTICE BRENNAN's dissent is premised on a revisionist reading of our precedents which leads to the conclusion that the Art. III requirement of standing is satisfied by any taxpayer who contends "that the Federal Government has exceeded the bounds of the law in allocating its largesse," *post,* at 508. "The concept of taxpayer injury necessarily recognizes the continuing stake of the taxpayer in the disposition of the Treasury to which he has contributed his taxes, and his right to have those funds put to lawful uses." *Post,* at 497–498. On this novel understanding, the dissent reads cases such as *Frothingham* and *Flast* as decisions on the merits of the taxpayers' claims. *Frothingham* is explained as a holding that a taxpayer ordinarily has no legal right to challenge congressional expenditures. *Post,* at 499. The dissent divines from *Flast* the holding that a taxpayer *does* have an enforceable right "to challenge a federal bestowal of largesse" for religious purposes. *Post,* at 509. This right extends to "the Government as a whole, regardless of which branch is at work in a particular instance," *post,* at 511, and regardless of whether the challenged action was an exercise of the spending power, *post,* at 512.

However appealing this reconstruction of precedent may be, it bears little resemblance to the cases on which it purports to rest. *Frothingham* and *Flast* were decisions that plainly turned on *standing,* and just as plainly they rejected any notion that the Art. III requirement of direct injury is satisfied by a taxpayer who contends "that the Federal Government

"The proposition that all constitutional provisions are enforceable by any citizen simply because citizens are the ultimate beneficiaries of those provisions has no boundaries." *Schlesinger* v. *Reservists Committee to Stop the War*, 418 U. S., at 227.

The complaint in this case shares a common deficiency with those in *Schlesinger* and *Richardson*. Although respondents claim that the Constitution has been violated, they claim nothing else. They fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in

---

has exceeded the bounds of the law in allocating its largesse." *Post*, at 508. Moreover, although the dissent's view may lead to a result satisfying to many in this case, it is not evident how its substitution of "legal interest," *post*, at 499, for "standing" enhances "our understanding of the meaning of rights under law," *post*, at 490. Logically, the dissent must shoulder the burden of explaining why taxpayers with standing have no "legal interest" in congressional expenditures except when it is possible to allege a violation of the Establishment Clause: yet it does not attempt to do so.

Nor does the dissent's interpretation of standing adequately explain cases such as *Schlesinger* and *Richardson*. According to the dissent, the taxpayer plaintiffs in those cases lacked standing, not because they failed to challenge an exercise of the spending power, but because they did not complain of "the distribution of Government largesse." *Post*, at 511. And yet if the standing of a taxpayer is established by his "continuing stake . . . in the disposition of the Treasury to which he has contributed his taxes," *post*, at 497–498, it would seem to follow that he can assert a right to examine the budget of the CIA, as in *Richardson*, see 418 U. S., at 170, and a right to argue that Members of Congress cannot claim Reserve pay from the Government, as in *Schlesinger*, see 418 U. S., at 211. Of course, both claims have been rejected, precisely because Art. III requires a demonstration of redressable injury that is not satisfied by a claim that tax moneys have been spent unlawfully.

constitutional terms. It is evident that respondents are firmly committed to the constitutional principle of separation of church and State, but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy. "[T]hat concrete adverseness which sharpens the presentation of issues," *Baker* v. *Carr*, 369 U. S., at 204, is the anticipated consequence of proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself.[21]

In reaching this conclusion, we do not retreat from our earlier holdings that standing may be predicated on noneconomic injury. See, *e. g.*, *United States* v. *SCRAP*, 412 U. S., at 686–688; *Association of Data Processing Service Orgs.* v. *Camp*, 397 U. S., at 153–154. We simply cannot see that respondents have alleged an *injury* of *any* kind, economic or otherwise, sufficient to confer standing.[22] Respondents com-

---

[21] In *Schlesinger*, we rejected the argument that standing should be recognized because "the adverse parties sharply conflicted in their interests and views and were supported by able briefs and arguments." 418 U. S., at 225:

"We have no doubt about the sincerity of respondents' stated objectives and the depth of their commitment to them. But the essence of standing 'is not a question of motivation but of possession of the requisite . . . interest that is, or is threatened to be, injured by the unconstitutional conduct.' *Doremus* v. *Board of Education*, 342 U. S. 429, 435 (1952)." *Id.*, at 225–226.

[22] Respondents rely on our statement in *Association of Data Processing Service Orgs.* v. *Camp*, 397 U. S., at 154, that "[a] person or family may have a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause and the Free Exercise Clause. *Abington School District* v. *Schempp*, 374 U. S. 203 [1963]." Respondents apparently construe this language to mean that any person asserting an Establishment Clause violation possesses a "spiritual stake" sufficient to confer standing. The language will not bear that weight. First, the language cannot be read apart from the context of its accompanying reference to *Abington School District* v. *Schempp*, 374 U. S. 203 (1963). In *Schempp*, the Court invalidated laws that required Bible

plain of a transfer of property located in Chester County, Pa. The named plaintiffs reside in Maryland and Virginia;[23] their organizational headquarters are located in Washington, D. C. They learned of the transfer through a news release. Their claim that the Government has violated the Establishment Clause does not provide a special license to roam the country in search of governmental wrongdoing and to reveal their discoveries in federal court.[24] The federal courts were simply not constituted as ombudsmen of the general welfare.

reading in the public schools. Plaintiffs were children who attended the schools in question, and their parents. The Court noted:

"It goes without saying that the laws and practices involved here can be challenged only by persons having standing to complain. . . . The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed. These interests surely suffice to give the parties standing to complain." *Id.*, at 224, n. 9.

The Court also drew a comparison with *Doremus* v. *Board of Education*, 342 U. S. 429 (1952), in which the identical substantive issues were raised, but in which the appeal was "dismissed upon the graduation of the school child involved and because of the appellants' failure to establish standing as taxpayers." 374 U. S., at 224, n. 9. The Court's discussion of the standing issue is not extensive, but it is sufficient to show the error in respondents' broad reading of the phrase "spiritual stake." The plaintiffs in *Schempp* had standing, not because their complaint rested on the Establishment Clause—for as *Doremus* demonstrated, that is insufficient—but because impressionable schoolchildren were subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them. Respondents have alleged no comparable injury.

[23] Respondent Americans United claims that it has certain unidentified members who reside in Pennsylvania. It does not explain, however, how this fact establishes a cognizable injury where none existed before. Respondent is still obligated to allege facts sufficient to establish that one or more of its members has suffered, or is threatened with, an injury other than their belief that the transfer violated the Constitution.

[24] Respondents also claim standing by reference to the Administrative Procedure Act, 5 U. S. C. § 702, which authorizes judicial review at the instance of any person who has been "adversely affected or aggrieved by

## V

The Court of Appeals in this case ignored unambiguous limitations on taxpayer and citizen standing. It appears to have done so out of the conviction that enforcement of the Establishment Clause demands special exceptions from the requirement that a plaintiff allege "'distinct and palpable injury to himself,' . . . that is likely to be redressed if the requested relief is granted." *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S., at 100 (quoting *Warth* v. *Seldin*, 422 U. S., at 501). The court derived precedential comfort from *Flast* v. *Cohen:* "The underlying justification for according standing in *Flast* it seems, was the implicit recognition that the Establishment Clause does create in every citizen a personal constitutional right, such that any citizen, including taxpayers, may contest under that clause the constitutionality of federal expenditures." 619 F. 2d, at 262.[25] The concurring opinion was even more direct. In its view, "statutes alleged to violate the Establishment Clause may not have an

agency action within the meaning of a relevant statute." Neither the Administrative Procedure Act, nor any other congressional enactment, can lower the threshold requirements of standing under Art. III. See, *e. g., Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S., at 100; *Warth* v. *Seldin*, 422 U. S., at 501. Respondents do not allege that the Act creates a legal right, "the invasion of which creates standing," *Linda R. S.* v. *Richard D.*, 410 U. S., at 617, n. 3, and there is no other basis for arguing that its existence alters the rules of standing otherwise applicable to this case.

[25] The majority believed that the only thing which prevented this Court from openly acknowledging this position was the fact that the complaint in *Flast* had alleged no basis for standing other than the plaintiffs' taxpayer status. 619 F. 2d, at 262. As the dissent below pointed out, this view is simply not in accord with the facts. See *id.*, at 269–270. The *Flast* plaintiffs and several *amici* strongly urged the Court to adopt the same view of standing for which respondents argue in this case. The Court plainly chose not to do so. Even if respondents were correct in arguing that the Court in *Flast* was bound by a "perceived limitation in the pleadings," 619 F. 2d, at 262, we are not so bound in this case, and we find no merit in respondents' vision of standing.

individual impact sufficient to confer standing in the traditional sense." *Id.*, at 267–268. To satisfy "the need for an available plaintiff," *id.*, at 267, and thereby to assure a basis for judicial review, respondents should be granted standing because, "as a practical matter, no one is better suited to bring this lawsuit and thus vindicate the freedoms embodied in the Establishment Clause," *id.*, at 266.

Implicit in the foregoing is the philosophy that the business of the federal courts is correcting constitutional errors, and that "cases and controversies" are at best merely convenient vehicles for doing so and at worst nuisances that may be dispensed with when they become obstacles to that transcendent endeavor. This philosophy has no place in our constitutional scheme. It does not become more palatable when the underlying merits concern the Establishment Clause. Respondents' claim of standing implicitly rests on the presumption that violations of the Establishment Clause typically will not cause injury sufficient to confer standing under the "traditional" view of Art. III. But "[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger* v. *Reservists Committee to Stop the War*, 418 U. S., at 227. This view would convert standing into a requirement that must be observed only when satisfied. Moreover, we are unwilling to assume that injured parties are nonexistent simply because they have not joined respondents in their suit. The law of averages is not a substitute for standing.

Were we to accept respondents' claim of standing in this case, there would be no principled basis for confining our exception to litigants relying on the Establishment Clause. Ultimately, that exception derives from the idea that the judicial power requires nothing more for its invocation than important issues and able litigants.[26] The existence of injured

---

[26] Were we to recognize standing premised on an "injury" consisting solely of an alleged violation of a "'personal constitutional right' to a gov-

parties who might not wish to bring suit becomes irrelevant. Because we are unwilling to countenance such a departure from the limits on judicial power contained in Art. III, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

A plaintiff's standing is a jurisdictional matter for Art. III courts, and thus a "threshold question" to be resolved before turning attention to more "substantive" issues. See *Linda R. S.* v. *Richard D.*, 410 U. S. 614, 616 (1973). But in consequence there is an impulse to decide difficult questions of substantive law obliquely in the course of opinions purporting to do nothing more than determine what the Court labels "standing"; this accounts for the phenomenon of opinions, such as the one today, that tend merely to obfuscate, rather than inform, our understanding of the meaning of rights under the law. The serious by-product of that practice is that the Court disregards its constitutional responsibility when, by failing to acknowledge the protections afforded by the Constitution, it uses "standing to slam the courthouse door against plaintiffs who are entitled to full consideration of their claims on the merits."[1]

The opinion of the Court is a stark example of this unfortunate trend of resolving cases at the "threshold" while obscur-

---

ernment that does not establish religion," *id.*, at 265, a principled consistency would dictate recognition of respondents' standing to challenge execution of every capital sentence on the basis of a personal right to a government that does not impose cruel and unusual punishment, or standing to challenge every affirmative-action program on the basis of a personal right to a government that does not deny equal protection of the laws, to choose but two among as many possible examples as there are commands in the Constitution.

[1] *Barlow* v. *Collins*, 397 U. S. 159, 178 (1970) (BRENNAN, J., concurring in result and dissenting).

ing the nature of the underlying rights and interests at stake. The Court waxes eloquent on the blend of prudential and constitutional considerations that combine to create our misguided "standing" jurisprudence. *But not one word is said about the Establishment Clause right that the plaintiff seeks to enforce.* And despite its pat recitation of our standing decisions, the opinion utterly fails, except by the sheerest form of *ipse dixit*, to explain why this case is unlike *Flast* v. *Cohen*, 392 U. S. 83 (1968), and is controlled instead by *Frothingham* v. *Mellon*, 262 U. S. 447 (1923).

## I

There is now much in the way of settled doctrine in our understanding of the injury-in-fact requirement of Art. III. At the core is the irreducible minimum that persons seeking judicial relief from an Art. III court have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends . . . ." *Baker* v. *Carr*, 369 U. S. 186, 204 (1962). See *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 72 (1978). Cases of this Court have identified the two essential components of this "personal stake" requirement. Plaintiff must have suffered, or be threatened with, some "distinct and palpable injury," *Warth* v. *Seldin*, 422 U. S. 490, 501 (1975). In addition, there must be some causal connection between plaintiff's asserted injury and defendant's challenged action. *Simon* v. *Eastern Kentucky Welfare Rights Org.*, 426 U. S. 26, 41 (1976); *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 261 (1977). The Constitution requires an Art. III court to ascertain that both requirements are met before proceeding to exercise its authority on behalf of any plaintiff, whether the form of relief requested is equitable or monetary.

But the existence of Art. III injury "often turns on the nature and source of the claim asserted." *Warth* v. *Seldin*,

*supra,* at 500.[2] Neither "palpable injury" nor "causation" is a term of unvarying meaning. There is much in the way of "mutual understandings" and "common-law traditions" that necessarily guides the definitional inquiry.[3] *In addition,* the Constitution, and by legislation the Congress, may impart a new, and on occasion unique, meaning to the terms "injury" and "causation" in particular statutory or constitutional contexts. The Court makes a fundamental mistake when it determines that a plaintiff has failed to satisfy the two-pronged "injury-in-fact" test, or indeed any other test of "standing," without first determining whether the Constitution or a statute defines injury, and creates a cause of action for redress of that injury, in precisely the circumstance presented to the Court.

It may of course happen that a person believing himself injured in some obscure manner by government action will be held to have no legal right under the constitutional or statutory provision upon which he relies, and will not be permitted to complain of the invasion of another person's "rights."[4] It

---

[2] "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 617, n. 3 (1973). The Framers of the Constitution, of course could, and did, exercise the same power.

[3] Justice Frankfurter identified two sources to assist in the definitional inquiry concerning injury:

"A litigant ordinarily has standing to challenge a governmental action of a sort that, if taken by a private person, would create a right of action cognizable by the courts. Or standing may be based on an interest created by the Constitution or a statute." *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 152 (1951) (concurring opinion) (citations omitted). In identifying the types of injuries that might be recognized in private law actions as a basis for suits against the Government, Justice Frankfurter felt free to draw on principles of "common law." *Id.,* at 152–153, 157–160.

[4] Of course, we generally permit persons to press federal suits even when the injury complained of is not obviously within the realm of injuries that a particular statutory or constitutional provision was designed to guard

is quite another matter to employ the rhetoric of "standing" to deprive a person, whose interest is clearly protected by the law, of the opportunity to prove that his own rights have been violated.   It is in precisely that dissembling enterprise that the Court indulges today.

The "case and controversy" limitation of Art. III overrides no other provision of the Constitution.[5]   To construe that Article to deny standing "'to the class for whose sake [a] constitutional protection is given,'"  *Jones* v. *United States,* 362 U. S. 257, 261 (1960), quoting *New York ex rel. Hatch* v. *Reardon,* 204 U. S. 152, 160 (1907), simply turns the Constitution on its head.   Article III was designed to provide a

---

against.   We term that circumstance one of "third-party standing."   In such situations, the Constitution requires us to determine whether the injury alleged is sufficiently "palpable" to fall within the contemplation of Art. III.   If plaintiff *has* suffered injury in fact within the contemplation of Art. III, but is *not* obviously within the reach of the particular statutory or constitutional provision upon which the plaintiff founds his claim, we then bring prudential considerations to bear to determine whether the plaintiff should be allowed to maintain his action.   See *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S. 59, 80–81 (1978).   In evaluating a claim of "third-party standing," we are, by definition, without specific constitutional or congressional direction, and are thus free to draw upon a wisdom peculiarly judicial in character—to elaborate upon the meaning of constitutionally cognizable injury, and then to weigh considerations of policy along with gleanings of legislative and constitutional intent, in order to determine whether the plaintiff should be permitted to maintain his claim.

With the understanding that "the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met," *id.,* at 81, we have only rarely interposed a bar to "third-party standing," particularly when constitutional violations are alleged.   Indeed, the only firm exception to this generally permissive attitude toward third-party suits is the restriction on taxpayer suits.   *Id.,* at 79–81.

[5] When the Constitution makes it clear that a particular person is to be protected from a particular form of government action, then that person has a "right" to be free of that action; when that right is infringed, then there is injury, and a personal stake, within the meaning of Art. III.

hospitable forum in which persons enjoying rights under the Constitution could assert those rights. How are we to discern whether a particular person is to be afforded a right of action in the courts? The Framers did not, of course, employ the modern vocabulary of standing. But this much is clear: The drafters of the Bill of Rights surely intended that the particular beneficiaries of their legacy should enjoy rights legally enforceable in courts of law.[6] See *West Virginia Bd. of Education* v. *Barnette*, 319 U. S. 624, 638 (1943).

With these observations in mind, I turn to the problem of taxpayer standing in general, and this case in particular.

## II

### A

*Frothingham* v. *Mellon*, 262 U. S. 447 (1923), involved a challenge to the Maternity Act of 1921, 42 Stat. 224, which provided financial grants to States that agreed to cooperate in programs designed to reduce infant and maternal mortality. Appellant contended that Congress, in enacting the program, had exceeded its authority under Art. I, and had intruded on authority reserved to the States. The Court described Mrs. Frothingham's claim as follows:

"[T]his plaintiff alleges . . . that she is a taxpayer of the United States; and her contention, though not clear, seems to be that the effect of the appropriations complained of will be to increase the burden of future taxation and thereby take her property without due process of law. The right of a taxpayer to enjoin the execution

---

[6] As James Madison noted, if a bill of rights were "incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." 1 Annals of Cong. 439 (1789).

of a federal appropriation act, on the ground that it is invalid and will result in taxation for illegal purposes, has never been passed upon by this Court." 262 U. S., at 486.

The Court conceded that it had historically treated the interest of a *municipal* taxpayer in the application of the municipality's funds as sufficiently direct and immediate to warrant injunctive relief to prevent misuse. *Ibid.* *Bradfield* v. *Roberts*, 175 U. S. 291 (1899), in which the Court permitted a federal taxpayer to present an Establishment Clause challenge to the use of federal money for the construction of hospital buildings in the District of Columbia, was held to fall within this rule because it was appropriate to treat the District of Columbia as a municipality.[7] But the Court distinguished Mrs. Frothingham's action against the United States:

> "[T]he relation of a taxpayer of the United States to the Federal Government is very different. His interest in the moneys of the Treasury—partly realized from taxation and partly from other sources—is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity.

---

[7] As an attempt to afford a taxpayer living in the District of Columbia with the same rights as a taxpayer living in a municipality, the Court's treatment of *Bradfield* has some persuasive force. But if the ban on federal taxpayer standing had been considered to be of constitutional origin, no analogy could have sufficed to cure the jurisdictional defect. Appellant had not alleged that he was a taxpayer of the District of Columbia, but rather that he was a "citizen and taxpayer *of the United States* and a *resident* of the District of Columbia." 175 U. S., at 295 (emphasis added). Although the court below deemed the suit to be against Ellis H. Roberts, not as Treasurer of the United States but as Treasurer of the District of Columbia, *Roberts* v. *Bradfield*, 12 App. D. C. 453, 459–460 (1898), standing plainly rested on appellant's federal taxpayer status.

"The administration of any statute, likely to produce additional taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern." 262 U. S., at 487.

After noting the importance of judicial restraint, the Court concluded:

"The party who invokes the [judicial] power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." *Id.*, at 488.

*Frothingham's* reasoning remains obscure.[8] The principal interpretive difficulty lies in the manner in which *Frothingham* chose to blend the language of policy with seemingly absolute statements about jurisdiction. For example, the Court commented with significance on the sheer number of taxpayers who might have raised a claim similar to that of Mrs. Frothingham. *Id.*, at 487. Yet it can hardly be argued that the Constitution bars from federal court a plaintiff who has suffered injury merely because others are similarly aggrieved. "[S]tanding is not to be denied simply

---

[8] The question apparently remains open whether *Frothingham* stated a prudential limitation or identified an Art. III barrier. See *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S., at 79, n. 25; *United States* v. *Richardson*, 418 U. S. 166, 181, 196, n. 18 (1974) (POWELL, J., concurring). It was generally agreed at the time of *Flast* v. *Cohen*, 392 U. S. 83, 92, n. 6, 101 (1968), and clearly the view of Justice Harlan in dissent, *id.*, at 130, that the rule stated reflected prudential and policy considerations, not constitutional limitations. Perhaps the case is most usefully understood as a "substantive" declaration of the legal rights of a taxpayer with respect to Government spending, coupled with a prudential restriction on the taxpayer's ability to raise the claims of third parties. Under any construction, however, *Frothingham* must give way to a taxpayer's suit brought under the Establishment Clause.

because many people suffer the same injury." *United States v. SCRAP*, 412 U. S. 669, 687 (1973). And it is equally clear that the Constitution draws no distinction between injuries that are large, and those that are comparatively small. The line between more dollars and less is no valid constitutional measure. Cf. *Everson v. Board of Education*, 330 U. S. 1, 48–49 (1947) (Rutledge, J., dissenting). The only distinction that a Constitution guaranteeing justice to all can recognize is one between some injury and none at all.[9]

*Frothingham* also stressed the indirectness of the taxpayer's injury. But, *as a matter of Art. III standing*, if the causal relationship is sufficiently certain, the length of the causal chain is irrelevant.[10] See *Warth v. Seldin*, 422 U. S., at 505. The financial stake of a federal taxpayer in the outcome of a lawsuit challenging an allegedly unlawful federal expenditure is not qualitatively different from that of a state or a municipal taxpayer attacking a local expenditure. More importantly, the injury suffered by a taxpayer is not dependent on the extent of his tax payment. The concept of taxpayer injury necessarily recognizes the continuing stake of the taxpayer in the disposition of the Treasury to which he

---

[9] Indeed, as noted in *Flast, supra,* the stake in the federal Treasury of major corporate taxpayers was not in any sense trivial. Indeed there was a time when a federal program involving an expenditure from the Treasury of $10 billion would very likely result in an increase of $150 million in the tax bill of a major corporation such as General Motors. See Hearings on S. 2097 before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 89th Cong., 2nd Sess., pt. 2, p. 493 (1966) (letter from K. C. Davis to Sen. Sam Ervin); Note, 69 Yale L. J. 895, 917, n. 127 (1960).

[10] Even if actual impact on the taxpayer's pocketbook were deemed the test of taxpayer standing, the cases in which a tenuous causal connection between the injury alleged and the challenged action formed the basis for denying plaintiffs standing do not control the case of a taxpayer challenging a Government expenditure. Compare *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U. S. 26 (1976); *Warth v. Seldin*, 422 U. S. 490 (1975); *Linda R. S. v. Richard D.*, 410 U. S. 614 (1973); with *Duke Power*

has contributed his taxes, and his right to have those funds put to lawful uses. Until *Frothingham* there was nothing in our precedents to indicate that this concept, so comfortably applied to municipal taxpayers, was inconsistent with the framework of rights and remedies established by the Federal Constitution.

The explanation for the limit on federal taxpayer "standing" imposed by *Frothingham* must be sought in more substantive realms. Justice Harlan, dissenting in *Flast*, came close to identifying what I consider the unstated premise of the *Frothingham* rule:

"[The] taxpayer's complaint can consist only of an allegation that public funds have been, or shortly will be, expended for purposes inconsistent with the Constitution. The taxpayer cannot ask the return of any portion of his previous tax payments, cannot prevent the collection of any existing tax debt, and cannot demand an adjudication of the propriety of any particular level of taxation. His tax payments are received for the general purposes of the United States, and are, upon proper receipt, lost in the general revenues." 392 U. S., at 128.

---

Co. v. *Carolina Environmental Study Group, Inc., supra;* and *United States* v. *SCRAP*, 412 U. S. 669 (1973). Frothingham's obstacle was not an inability to show that the alleged injury was "likely to be redressed by a favorable decision." *Simon, supra,* at 38.

In each of the above-cited cases in which standing was denied, the difficulty was that an intermediate link in the causal chain—a third party beyond the control of the court—might serve to bar effective relief. Even if the court acceded to plaintiffs' view of the law, the court's decree might prove ineffectual to relieve plaintiffs' injury because of the independent action of some third party. See 426 U. S., at 41–42; *Warth* v. *Seldin, supra,* at 505–507. The situation of the taxpayer is not comparable because there is no problem of intervening cause. The defendant has the full power to correct the plaintiff's difficulty and, if the court concludes that as a matter of law and fact plaintiff is indeed required to provide defendant redress, it has the power to provide relief. The factual aspect of the causal connection is sure.

In a similar vein, the Government argued in *Flast* that taxpayer suits involve only a disagreement by the taxpayer with the uses to which tax revenues were committed, and that the resolution of such disagreements is entrusted to branches of the Federal Government other than the judiciary. *Id.*, at 98. The arguments of both the Government and Justice Harlan are phrased, as they must be, not in the language of "standing," but of "legal rights" and "justiciable issues."

The *Frothingham* rule may be seen as founded solely on the prudential judgment by the Court that precipitate and unnecessary interference in the activities of a coequal branch of government should be avoided. Alternatively, *Frothingham* may be construed as resting upon an unarticulated, constitutionally established barrier between Congress' power to tax and its power to spend, which barrier makes it analytically impossible to mount an assault on the former through a challenge to the latter. But it is sufficient for present purposes to say that *Frothingham* held that the federal taxpayer has no continuing legal interest in the affairs of the Treasury analogous to a shareholder's continuing interest in the conduct of a corporation.

Whatever its provenance, the general rule of *Frothingham* displays sound judgment: Courts must be circumspect in dealing with the taxing power in order to avoid unnecessary intrusion into the functions of the Legislative and Executive Branches. Congress' *purpose* in taxing will not ordinarily affect the validity of the tax. Unless the tax *operates* unconstitutionally, see, *e. g., Murdock* v. *Pennsylvania,* 319 U. S. 105 (1943), the taxpayer may not object to the use of his funds. Mrs. Frothingham's argument, that the use of tax funds for purposes unauthorized by the Constitution amounted to a violation of due process, did not provide her with the required legal interest because the Due Process Clause of the Fifth Amendment does not protect taxpayers against increases in tax liability. See *Flast* v. *Cohen,* 392 U. S., at 105. Mrs. Frothingham's claim was thus reduced

to an assertion of "the States' interest in their legislative prerogatives," *ibid.*, a third-party claim that could properly be barred.[11]   But in *Flast* the Court faced a different sort of constitutional claim, and found itself compelled to retreat from the general assertion in *Frothingham* that taxpayers have *no* interest in the disposition of their tax payments.   To understand why *Frothingham*'s bar necessarily gave way in the face of an Establishment Clause claim, we must examine the right asserted by a taxpayer making such a claim.

## B

In 1947, nine Justices of this Court recognized that the Establishment Clause does impose a very definite restriction on the power to tax.[12]   The Court held in *Everson* v. *Board of Education*, 330 U. S., at 15, that the " 'establishment of religion' clause of the First Amendment means at least this: "

---

[11] With respect to the enforcement of constitutional restrictions, we have not been overly elegant in defining the class of persons who may object to particular forms of government action.   Only the constitutional minimum of injury in fact has been required.   As the Court recently noted: "We . . . cannot accept the contention that, outside the context of taxpayers' suits, a litigant must demonstrate something more than injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S., at 79.   See *Schlesinger* v. *Reservists Committee to Stop the War*, 418 U. S. 208, 225, n. 15 (1974).   Nevertheless, I do not suggest that the *Frothingham* limitation on federal taxpayer suits should be abandoned.   The barrier it evinces between the taxing power and the spending power, whether it be deemed one of constitutional construction or judicial prudence, reflects fundamental conceptions about the nature of the legislative process, and is, in any event, now firmly embedded in our cases. That barrier is necessarily pierced, however, by an Establishment Clause claim.

[12] Justice Black, joined by Chief Justice Vinson, and Justices Reed, Douglas, and Murphy, wrote for the majority and concluded that the challenged activity was not a support of religion; Justice Jackson wrote one dissent joined in by Justice Frankfurter; Justice Rutledge also authored a dissent, in which Justices Jackson, Frankfurter, and Burton joined.   Both dissents clearly affirmed this constitutional restriction on the power to tax. 330 U. S., at 22, 33.

"No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt, to teach or practice religion." *Id.*, at 16.

The Members of the Court could not have been more explicit. "One of our basic rights is to be free of taxation to support a transgression of the constitutional command that the authorities 'shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" *Id.*, at 22 (Jackson, J., dissenting). "[A]part from efforts to inject religious training or exercises and sectarian issues into the public schools, the only serious threat to maintaining that complete and permanent separation of religion and civil power which the First Amendment commands is through the use of the taxing power to support religion, religious establishments, or establishments having a religious foundation whatever their form or special religious function. . . . [M]oney taken by taxation from one is not to be used or given to support another's religious training of belief, or indeed one's own." *Id.*, at 44 (Rutledge, J., dissenting).

In determining whether the law challenged in *Everson* was one "respecting an establishment of religion," the Court did not fail to examine the historic meaning of the constitutional language, "particularly with respect to the imposition of taxes." *Id.*, at 8. For as Justice Rutledge pointed out in his dissent: "No provision of the Constitution is more closely tied to or given content by its generating history than the religious clause of the First Amendment. It is at once the refined product and the terse summation of that history." *Id.*, at 33. That history bears a brief repetition in the present context.

Many of the early settlers of this Nation came here to escape the tyranny of laws that compelled the support of government-sponsored churches and that inflicted punishments for the failure to pay establishment taxes and tithes. *Id.*, at 8–9. But the inhabitants of the various Colonies soon dis-

played a capacity to recreate the oppressive practices of the countries that they had fled. Once again persons of minority faiths were persecuted, and again such persons were subjected—this time by the colonial governments—to tithes and taxes for support of religion. *Id.*, at 10, and n. 8; *Reynolds* v. *United States*, 98 U. S. 145, 162–163 (1879).

> "These practices became so commonplace as to shock the freedom-loving colonials into a feeling of abhorrence. The imposition of taxes to pay ministers' salaries and to build and maintain churches and church property aroused their indignation. It was these feelings which found expression in the First Amendment." *Everson, supra*, at 11 (footnotes omitted).

In 1784–1785, before the adoption of the Constitution, the continuing conflict between those who saw state aid to religion as but the natural expression of "commonly shared" religious sentiments, and those who saw such support as a threat to the very notion of civil government, culminated in the battle fought in the Virginia House of Delegates over "a bill establishing provision for teachers of the Christian religion." [13] *Reynolds, supra*, at 162–163. The introduction of that bill in the state assembly prompted James Madison to prepare and circulate his famous "Memorial and Remonstrance Against Religious Assessments," imploring the legislature to establish and maintain the complete separation of religion and civil authority, and thus to reject the bill. In the end, the bill was rejected by the Virginia Legislature, and in its place Madison succeeded in securing the enactment of "A Bill for Establishing Religious Freedom," first introduced in the Virginia General Assembly seven years earlier by Thomas Jefferson. 98 U. S., at 163; *Everson*, 330 U. S.,

---

[13] The bill, and Madison's Remonstrance, are both appended to the dissenting opinion of Justice Rutledge in *Everson. Id.*, at 63–74.

at 11–13 (majority opinion); *id.*, at 35–40 (Rutledge, J., dissenting). Because Madison and Jefferson played such leading roles in the events leading to the adoption of the First Amendment, the *Everson* opinions did not hesitate to reproduce the partial text of their Virginia bill as a primary source for understanding the objectives, and protections, afforded by the more concise phrasing of the Establishment Clause. *Everson, supra,* at 12–13, 28; see *Reynolds, supra,* at 163–164. Extracts from that bill also bear repeating in the present context. The preamble provided, in part:

> "[T]o compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical; that even the forcing him to support this or that teacher of his own religious persuasion, is depriving him of the comfortable liberty of giving his contributions to the particular pastor, whose morals he would make his pattern." 12 Hening's Stat. 85.

Its operative language emphatically stated:

> "That no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief . . . ." *Id.*, at 86.[14]

Justice Rutledge summed up Madison's views in the following terms:

> "In no phase was he more unrelentingly absolute than in opposing state support or aid by taxation. Not even 'three pence' contribution was thus to be exacted from

---

[14] Although the bill is in some sense merely the pronouncement of a small legislative body, its proscription was intended to transcend temporal bounds. The enactment concludes:

"And though we well know that this Assembly, enacted by the people for the ordinary purposes of legislation only, have no power to restrain the

any citizen for such a purpose. Tithes had been the life-blood of establishment before and after other compulsions disappeared. Madison and his coworkers made no exceptions or abridgments to the complete separation [between church and state] they created. Their objection was not to small tithes. It was to any tithes whatsoever. 'If it were lawful to impose a small tax for religion, the admission would pave the way for oppressive levies.' Not the amount, but 'the principle of the assessment was wrong.'" *Everson, supra,* at 40–41 (citation omitted).

It is clear, in the light of this history, that one of the primary purposes of the Establishment Clause was to prevent the use of tax moneys for religious purposes. *The taxpayer was the direct and intended beneficiary of the prohibition on financial aid to religion.*[15] This basic understanding of the meaning of the Establishment Clause explains why the Court in *Everson,* while rejecting appellant's claim on the merits,

---

acts of succeeding assemblies, constituted with powers equal to our own, and that therefore to declare this act to be irrevocable would be of no effect in law; yet we are free to declare, and do declare, that the rights hereby asserted are of the natural rights of mankind, and that if any act shall be hereafter passed to repeal the present, or to narrow its operation, such act will be an infringement of natural right." 12 Hening's Stat. 86.

By incorporation of its principles in the Bill of Rights, the bill was transformed from mere hortatory expression, into a guarantee of lasting and binding rights against the Government.

[15] The position of a taxpayer with respect to a Government grant of a tax exemption to a religious institution is qualitatively different from the position of a taxpayer objecting to a subsidy.

"A subsidy involves the direct transfer of public monies to the subsidized enterprise and uses resources exacted from taxpayers as a whole. An exemption, on the other hand, involves no such transfer. It assists the exempted enterprise only passively, by relieving a privately funded venture of the burden of paying taxes. In other words, '[i]n the case of direct subsidy, the state forcibly diverts the income of both believers and nonbelievers to churches,' while '[i]n the case of an exemption, the state merely refrains from diverting to its own uses income independently generated by

perceived the issue presented there as it did. The appellant sued "in his capacity as a district taxpayer," 330 U. S., at 3, challenging the actions of the Board of Education in passing a resolution providing reimbursement to parents for the cost of transporting their children to parochial schools, and seeking to have that resolution "set aside." Appellant's Establishment Clause claim was precisely that the "statute . . . forced inhabitants to pay taxes to help support and maintain" church schools. *Id.*, at 5. It seems obvious that all the Justices who participated in *Everson* would have agreed with Justice Jackson's succinct statement of the question presented: "Is it constitutional to tax this complainant to pay the cost of carrying pupils to Church schools of one specified denomination?" *Id.*, at 21 (dissenting opinion). Given this view of the issues, could it fairly be doubted that this taxpayer alleged injury in precisely the form that the Establishment Clause sought to make actionable? [16]

## C

In *Flast* v. *Cohen*, 392 U. S. 83 (1968), federal taxpayers sought to challenge the Department of Health, Education, and Welfare's administration of the Elementary and Second-

---

the churches through voluntary contributions.'" *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664, 690–691 (1970) (BRENNAN, J., concurring) (footnote omitted), quoting Gianella, Religious Liberty, Nonestablishment, and Doctrinal Development, pt. 2, 81 Harv. L. Rev. 513, 533 (1968).

Of course, irrespective of the taxpayers' stake in the controversy, in terms of the prohibition on government action imposed by the Establishment Clause, there is also a qualitative difference between a subsidy and an exemption. *Ibid.*

[16] Justice Jackson, writing for the Court in *Doremus* v. *Board of Education*, 342 U. S. 429 (1952), explored the limitations of taxpayer standing under the Establishment Clause. In that case two New Jersey taxpayers challenged a New Jersey law that directed public school teachers to read selected passages from the Bible, seeking a declaratory judgment that such a law violated the Establishment Clause. The Court concluded that the taxpayer lacked standing:

"There is no allegation that this activity is supported by any separate tax

ary Education Act of 1965: specifically the Department's practice of allowing funds distributed under that Act to be used to finance instruction in religious schools. Appellants urged that the use of federal funds for such a purpose violated the Establishment and Free Exercise Clauses of the First Amendment, and sought a declaration that this use of federal funds was not authorized by the Act, or that to the extent the use was authorized, the Act was "unconstitutional and void." Appellants further sought an injunction to bar appellees from approving any expenditure of funds for the allegedly unconstitutional purposes. *Id.*, at 86–88. The *Frothingham* rule stood as a seemingly absolute barrier to the maintenance of the claim. The Court held, however, that the *Frothingham* barrier could be overcome by any claim that met both requirements of a two-part "nexus" test.

The Justices who participated in *Flast* were not unaware of the Court's continued recognition of a federally cognizable "case or controversy" when a *local* taxpayer seeks to challenge as unconstitutional the use of a *municipality's* funds—

---

or paid for from any particular appropriation or that it adds any sum whatever to the cost of conducting the school. No information is given as to what kind of taxes are paid by appellants and there is no averment that the Bible reading increases any tax they do pay or that as taxpayers they are, will, or possibly can be out of pocket because of it." *Id.*, at 433.

The Court had no difficulty distinguishing *Everson:*

"Everson showed a measurable appropriation or disbursement of school-district funds occasioned solely by the activities complained of. This complaint does not." 342 U. S., at 434.

The difference between the two cases is relevant to the "standing" of taxpayers generally and most especially to taxpayers asserting claims under the Establishment Clause, for it is clear that even under the Establishment Clause the taxpayer's protection was against the use of his funds and not against the conduct of the government generally. The distinction between *Doremus* and *Everson* may be phrased alternatively: Everson was injured in a manner comprehended by the Establishment Clause, and Doremus was not.

the propriety of which had, of course, gone unquestioned in *Everson*.[17] The Court was aware as well of the rule stated in *Doremus* v. *Board of Education*, 342 U. S. 429 (1952), that the interest of a taxpayer, even one raising an Establishment Clause claim, was limited to the actions of a government involving the expenditure of funds. But in reaching its holding, it is also quite clear that the Court was responding, not only to *Everson*'s continued acceptance of municipal taxpayer actions but also to *Everson*'s exposition of the history and meaning of the Establishment Clause. See *Flast, supra,* at 103–104.

It is at once apparent that the test of standing formulated by the Court in *Flast* sought to reconcile the developing doctrine of taxpayer "standing" with the Court's historical understanding that the Establishment Clause was intended to prohibit the Federal Government from using tax funds for the advancement of religion, and thus the constitutional imperative of taxpayer standing in certain cases brought pursuant to the Establishment Clause. The two-pronged "nexus" test offered by the Court, despite its general language,[18] is

---

[17] The anomaly of allowing a municipality's actions to be challenged by a local taxpayer in federal court as a violation of the Establishment Clause, made applicable to the States by virtue of the Fourteenth Amendment, while exempting the Federal Government, whose use of the taxing power in aid of religion was the target of the Framers' adoption of the Establishment Clause, also must have been apparent to the Court.

[18] The test was formulated with the Establishment Clause in mind, but the Court wisely sought to phrase the principle it stood for in general terms:

"We have noted that the Establishment Clause of the First Amendment does specifically limit the taxing and spending power conferred by Art. I, § 8. Whether the Constitution contains other specific limitations can be determined only in the context of future cases. However, whenever such specific limitations are found, we believe a taxpayer will have a clear stake as a taxpayer in assuring that they are not breached by Congress. Consequently, we hold that a taxpayer will have standing consistent with Article III to invoke federal judicial power when he alleges that congressional

best understood as "a determinant of standing of plaintiffs alleging only injury as taxpayers who challenge alleged violations of the Establishment and Free Exercise Clauses of the First Amendment," and not as a general statement of standing principles. *Schlesinger* v. *Reservists Committee to Stop the War*, 418 U. S. 208, 238 (1974) (BRENNAN, J., dissenting); *Flast*, 392 U. S., at 102. The test explains what forms of governmental action may be attacked by someone alleging *only* taxpayer status, and, without ruling out the possibility that history might reveal another similarly founded provision, explains why an Establishment Clause claim is treated differently from any other assertion that the Federal Government has exceeded the bounds of the law in allocating its largesse. Thus, consistent with *Doremus*, *Flast* required, as the first prong of its test, that the taxpayer demonstrate a logical connection between his taxpayer status and the type of legislation attacked. *Flast, supra,* at 102. Appellants' challenge to a program of grants to educational institutions clearly satisfied this first requirement. 392 U. S., at 103. As the second prong, consistent with the prohibition of taxpayer claims of the kind advanced in *Frothingham*, appellants were required to show a connection between their status and the precise nature of the infringement alleged. *Flast*, 392 U. S., at 102. They had no difficulty meeting this requirement: the Court agreed that the Establishment Clause jealously protects taxpayers from diversion of their funds to the support of religion through the offices of the Federal Government. *Id.*, at 103–104.

---

action under the taxing and spending clause is in derogation of those constitutional provisions which operate to restrict the exercise of the taxing and spending power. The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power." 392 U. S., at 105–106.

In the years since the announcement of the *Flast* test we have yet to recognize a similar restriction on Congress' power to tax, and I know of none. Nevertheless, like the Justices who joined in the Court opinion in *Flast*, I remain reluctant to rule out the possibility.

The nexus test that the Court "announced," *id.*, at 102–103, sought to maintain necessary continuity with prior cases, and set forth principles to guide future cases involving taxpayer standing. But *Flast* did not depart from the principle that no judgment about standing should be made without a fundamental understanding of the rights at issue. *Id.*, at 102. The two-part *Flast* test did not supply the rationale for the Court's decision, but rather its exposition: That rationale was supplied by an understanding of the nature of the restrictions on government power imposed by the Constitution and the intended beneficiaries of those restrictions.

It may be that Congress can tax for *almost* any reason, or for no reason at all. There is, so far as I have been able to discern, but one constitutionally imposed limit on that authority. Congress cannot use tax money to support a church, or to encourage religion. That is "*the* forbidden exaction." *Everson* v. *Board of Education*, 330 U. S., at 45 (Rutledge, J., dissenting) (emphasis added). See *Flast*, *supra*, at 115–116 (Fortas, J., concurring). In absolute terms the history of the Establishment Clause of the First Amendment makes this clear. History also makes it clear that the federal taxpayer is a singularly "proper and appropriate party to invoke a federal court's jurisdiction" to challenge a federal bestowal of largesse as a violation of the Establishment Clause. Each, and indeed every, federal taxpayer suffers precisely the injury that the Establishment Clause guards against when the Federal Government directs that funds be taken from the pocketbooks of the citizenry and placed into the coffers of the ministry.

A taxpayer cannot be asked to raise his objection to such use of his funds at the time he pays his tax. Apart from the unlikely circumstance in which the Government announced in advance that a particular levy would be used for religious subsidies, taxpayers could hardly assert that they were being injured until the Government actually lent its support to a religious venture. Nor would it be reasonable to require him to address his claim to those officials charged with the collec-

tion of federal taxes. Those officials would be without the means to provide appropriate redress—there is no practical way to segregate the complaining taxpayer's money from that being devoted to the religious purpose. Surely, then, a taxpayer must have standing at the time that he learns of the Government's alleged Establishment Clause violation to seek equitable relief in order to halt the continuing and intolerable burden on his pocketbook, his conscience, and his constitutional rights.

## III

Blind to history, the Court attempts to distinguish this case from *Flast* by wrenching snippets of language from our opinions, and by perfunctorily applying that language under color of the first prong of *Flast*'s two-part nexus test. The tortuous distinctions thus produced are specious, at best: at worst, they are pernicious to our constitutional heritage.

First, the Court finds this case different from *Flast* because here the "source of [plaintiffs'] complaint is not a *congressional* action, but a decision by HEW to transfer a parcel of federal property." *Ante*, at 479 (emphasis added). This attempt at distinction cannot withstand scrutiny. *Flast* involved a challenge to the actions of the Commissioner of Education, and other officials of HEW, in disbursing funds under the Elementary and Secondary Education Act of 1965 to "religious and sectarian" schools. Plaintiffs disclaimed "any intent[ion] to challenge . . . all programs under . . . the Act." *Flast, supra*, at 87. Rather, they claimed that defendant-administrators' approval of such expenditures was not authorized by the Act, or alternatively, to the extent the expenditures were authorized, the Act was "unconstitutional and void." *Ibid.* In the present case, respondents challenge HEW's grant of property pursuant to the Federal Property and Administrative Services Act of 1949, seeking to enjoin HEW "from making a grant of this and other property to the [defendant] so long as such a grant will violate the Establishment Clause." App. 12. It may be that the Court is concerned with the adequacy of respondents' pleading; re-

spondents have not, in so many words, asked for a declaration that the "Federal Property and Administrative Services Act is unconstitutional and void to the extent that it authorizes HEW's actions." I would not construe their complaint so narrowly.

More fundamentally, no clear division can be drawn in this context between actions of the Legislative Branch and those of the Executive Branch. To be sure, the First Amendment is phrased as a restriction on Congress' legislative authority; this is only natural since the Constitution assigns the authority to legislate and appropriate only to the Congress. But it is difficult to conceive of an expenditure for which the last governmental actor, either implementing directly the legislative will, or acting within the scope of legislatively delegated authority, is not an Executive Branch official. The First Amendment binds the Government as a whole, regardless of which branch is at work in a particular instance.

The Court's second purported distinction between this case and *Flast* is equally unavailing. The majority finds it "decisive" that the Federal Property and Administrative Services Act of 1949 "was an evident exercise of Congress' power under the Property Clause, Art. IV, § 3, cl. 2," *ante*, at 480, while the Government action in *Flast* was taken under Art. I, § 8. The Court relies on *United States* v. *Richardson*, 418 U. S. 166 (1974), and *Schlesinger* v. *Reservists Committee to Stop the War*, 418 U. S. 208 (1974), to support the distinction between the two Clauses, noting that those cases involved alleged deviations from the requirements of Art. I, § 9, cl. 7, and Art. I, § 6, cl. 2, respectively. The standing defect in each case was *not*, however, the failure to allege a violation of the Spending Clause; rather, the taxpayers in those cases had not complained of the distribution of Government largesse, and thus failed to meet the essential requirement of taxpayer standing recognized in *Doremus*.

It can make no constitutional difference in the case before us whether the donation to the petitioner here was in the form of a cash grant to build a facility, see *Tilton* v. *Richard-*

*son,* 403 U. S. 672 (1971), or in the nature of a gift of property including a facility already built. That this is a meaningless distinction is illustrated by *Tilton.* In that case, taxpayers were afforded standing to object to the fact that the Government had not received adequate assurance that if the property that it financed for use as an educational facility was later converted to religious uses, it would receive full value for the property, as the Constitution requires. The complaint here is precisely that, although the property at issue is actually being used for a sectarian purpose, the Government has not received, nor demanded, full value payment.[19] Whether undertaken pursuant to the Property Clause or the Spending Clause, the breach of the Establishment Clause, and the relationship of the taxpayer to that breach, is precisely the same.[20]

---

[19] It is uncontested here that the property at issue was initially purchased with tax funds, and bears the mark of $10 million in federal improvements. At the time of its transfer to the petitioner, its fair market value was approximately $1.3 million. *Americans United* v. *U. S. Dept. of HEW,* 619 F. 2d 252, 253 (CA3 1980).

The Federal Property and Administrative Services Act of 1949 clearly requires that, whenever possible, fair market value is to be received for property transferred pursuant to its provisions. See 40 U. S. C. §§ 484(e)(1), 484(e)(3)(G). Proceeds "from any sale, lease, or other disposition of surplus property, shall be covered into the Treasury as miscellaneous receipts . . . ." 40 U. S. C. § 485(a).

The Act provides, however, that "surplus real property, including buildings, fixtures and equipment situated thereon" may be designated by HEW as necessary for "school, classroom, or other educational use." 40 U. S. C. § 484(k)(1). Such property may be transferred to a "nonprofit educational institution." 40 U. S. C. § 484(k)(1)(A). In fixing the price of such property, the Secretary is required to consider any benefit that may accrue to the United States from the use of the property. 40 U. S. C. § 484(k)(1)(C). By failing to require any payment from petitioner college, the Secretary apparently determined that the benefit to the United States exceeded the fair market value. But it is entirely clear from *Tilton* that if the facility is and was used for sectarian purposes, the Government was required to obtain full market value at the time such use commences.

[20] The Framers of the First Amendment could not have viewed it as less objectionable to the taxpayer to learn that his tax funds were used by his

## IV

Plainly hostile to the Framers' understanding of the Establishment Clause, and *Flast*'s enforcement of that understanding, the Court vents that hostility under the guise of standing, "to slam the courthouse door against plaintiffs who [as the Framers intended] are entitled to full consideration of their [Establishment Clause] claims on the merits." *Barlow* v. *Collins*, 397 U. S. 159, 178 (1970) (BRENNAN, J., concurring in result and dissenting). Therefore, I dissent.

JUSTICE STEVENS, dissenting.

In Parts I, II, and III of his dissenting opinion, JUSTICE BRENNAN demonstrates that respondent taxpayers have standing to mount an Establishment Clause challenge against the Federal Government's transfer of property worth $1,300,000 to the Assemblies of God. For the Court to hold

---

Government to purchase property, construct a church, and deed the property to a religious order, than to find his Government providing the funds to a church to undertake its own construction. So far as the Establishment Clause and the position of the taxpayer are concerned, the situations are interchangeable. Surely James Madison perceived no nice distinction between a grant of land and a grant of funds, when he vetoed a bill providing certain land to a church:

"[T]he bill in reserving a certain parcel of land of the United States for the use of said [church] comprises a principle and precedent for the appropriation of funds of the United States for the use and support of religious societies, contrary to the article of the Constitution which declares that 'Congress shall make no law respecting a religious establishment.'" 1 J. Richardson, Messages and Papers of the Presidents 490 (1897).

Nor has Congress perceived a distinction between an appropriation of money and an appropriation of property. For example, in 1896 Congress included in its Appropriation Act for the District of Columbia a statement declaring it "to be the policy of the Government of the United States to make no appropriation of money or property for the purpose of founding, maintaining, or aiding by payment for services, expenses, or otherwise, any church or religious denomination, or any institution or society which is under sectarian or ecclesiastical control." 29 Stat. 411. See *Lemon* v. *Kurtzman*, 403 U. S. 602, 648 (1971) (opinion of BRENNAN, J.).

that plaintiffs' standing depends on whether the Government's transfer was an exercise of its power to spend money, on the one hand, or its power to dispose of tangible property, on the other, is to trivialize the standing doctrine.

One cannot read the Court's opinion and the concurring opinions of Justice Stewart and Justice Fortas in *Flast* v. *Cohen*, 392 U. S. 83, without forming the firm conclusion that the plaintiffs' invocation of the Establishment Clause was of decisive importance in resolving the standing issue in that case. Justice Fortas made this point directly:

"I agree that the congressional powers to tax and spend are limited by the prohibition upon Congress to enact laws 'respecting an establishment of religion.' This thesis, slender as its basis is, provides a direct 'nexus,' as the Court puts it, between the use and collection of taxes and the congressional action here. Because of this unique 'nexus,' in my judgment, it is not far-fetched to recognize that a taxpayer has a special claim to status as a litigant in a case raising the 'establishment' issue. This special claim is enough, I think, to permit us to allow the suit, coupled, as it is, with the interest which the taxpayer and all other citizens have in the church-state issue. In terms of the structure and basic philosophy of our constitutional government, it would be difficult to point to any issue that has a more intimate, pervasive, and fundamental impact upon the life of the taxpayer—and upon the life of all citizens.

"Perhaps the vital interest of a citizen in the establishment issue, without reference to his taxpayer's status, would be acceptable as a basis for this challenge. We need not decide this. But certainly, I believe, we must recognize that our principle of judicial scrutiny of legislative acts which raise important constitutional questions requires that the issue here presented—the separation of state and church—which the Founding Fathers re-

garded as fundamental to our constitutional system—should be subjected to judicial testing. This is not a question which we, if we are to be faithful to our trust, should consign to limbo, unacknowledged, unresolved, and undecided.

"On the other hand, the urgent necessities of this case and the precarious opening through which we find our way to confront it, do not demand that we open the door to a general assault upon exercises of the spending power. The status of taxpayer should not be accepted as a launching pad for an attack upon any target other than legislation affecting the Establishment Clause." *Id.*, at 115–116.

Today the Court holds, in effect, that the Judiciary has no greater role in enforcing the Establishment Clause than in enforcing other "norm[s] of conduct which the Federal Government is bound to honor," *ante*, at 484, such as the Accounts Clause, *United States* v. *Richardson*, 418 U. S. 166, and the Incompatibility Clause, *Schlesinger* v. *Reservists Committee to Stop the War*, 418 U. S. 208. Ironically, however, its decision rests on the premise that the difference between a disposition of funds pursuant to the Spending Clause and a disposition of realty pursuant to the Property Clause is of fundamental jurisprudential significance. With all due respect, I am persuaded that the essential holding of *Flast* v. *Cohen* attaches special importance to the Establishment Clause and does not permit the drawing of a tenuous distinction between the Spending Clause and the Property Clause.

For this reason, and for the reasons stated in Parts I, II, and III of JUSTICE BRENNAN's opinion, I would affirm the judgment of the Court of Appeals.