Paul H. BAEDER, Plaintiff,

v.

Margaret HECKLER, Secretary of Health and Human Services of the United States, Defendant.

Civ. A. No. 83–3338.

United States District Court,
D. New Jersey.

Sept. 10, 1984.

Tomar, Parks, Seliger, Simonoff & Adourian by James Katz, Haddonfield, N.J., for plaintiff.

U.S. Atty. W. Hunt Dumont by Edward G. Spell, Asst. U.S. Atty., Newark, N.J., for defendant.

## OPINION

GERRY, District Judge.

### 1. *Procedural History.*

This is an action brought under § 205(g) of the Social Security Act, as amended (hereinafter referred to as the Act), 42 U.S.C. § 405(g), to review a final determination of the Secretary of Health and Human Services (hereinafter referred to as the Secretary), which denied plaintiff's application for a period of disability and disability insurance benefits.

The plaintiff, Paul Baeder, applied for disability benefits on November 17, 1982. His application was denied by the Secretary, both initially and on reconsideration. (Court Transcript, pp. 41–2, 46–7.) Plaintiff thereafter requested a hearing, which was held on March 4, 1983, before Wallace Tannenbaum, an Administrative Law Judge (hereinafter referred to as the ALJ). After a *de novo* consideration of Mr. Baeder's case, the ALJ ruled on May 27, 1983 that Mr. Baeder was not disabled within the meaning of the Act. (*Id.*, pp. 9–12.) The ALJ's ruling became the final decision of the Secretary when it was approved by the Appeals Council on July 21, 1983. (*Id.*, p. 2.) Plaintiff then brought the present suit seeking this court's review of the Secretary's decision.

### 2. *The ALJ's Decision.*

Plaintiff had been employed from 1950 to 1980 as an operator of a glass bottle machine at the Owens-Illinois Glass Company plant. (Court Transcript, pp. 25, 33, 67.) This rather strenuous job required Mr. Baeder to lift and carry loads weighing between 5 and 35 pounds frequently during the day. In addition, the job required continual bending, reaching and climbing, as well as constant standing and walking. (*Id.*, p. 68.) Because of plaintiff's developing problems with arthritis, chest pains, respiratory impairments, dizziness and headaches, he spent the last three years of his employment attempting to do less strenuous work, such as that of "spare boy" (viz., a temporary replacement for the regular bottling machine operators) and janitor. (*Id.*, pp. 25–6, 33–4.) After approximately 30 years of work, Mr. Baeder left his job in January of 1980, purportedly because his physical impairments precluded his continuing at such employment. (*Id.*, pp. 25–6.)

The ALJ decided plaintiff's case by following the Secretary's five-step disability evaluation procedure, outlined in 20 C.F.R. 404.1520(a). The brief text of the ALJ's decision contains a rather cursory review of the record, after which the ALJ found that plaintiff did not suffer from a "severe impairment." Under 404.1520(c), the plaintiff was deemed to be "not disabled." Accordingly, the ALJ did not directly consider Mr. Baeder's individual vocational abilities and simply concluded that Mr. Baeder had "the residual functional capacity to perform basic work activities at a substantial gainful level." (*Id.*, p. 11.)

Among the ALJ's specific "findings" were that Mr. Baeder's physical impairments did not preclude his return to "past relevant work." (*Id.*) Presumably, the ALJ must have believed that the plaintiff had not met his initial burden of showing that his impairments prevented him from returning to his former job as a glass bottle machine operator. *See, e.g., Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir.1979). Hence, plaintiff's application for disability benefits was denied.

### 3. *Analysis of the Secretary's Factual Determinations.*

Under 42 U.S.C. § 405(g), it is the function of this court on review of the Secretary's ruling to decide if that ruling was based upon "substantial evidence," defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420,

1427, 28 L.Ed.2d 842 (1971), (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). In addition, even when the Secretary's factual findings are supported by substantial evidence, it is also the duty of this court to determine whether the Secretary's rulings are based upon correct legal standards. *See, e.g., Strickland v. Harris*, 615 F.2d 1103, 1108 (5th Cir.1980). Moreover, this court has the authority to scrutinize the various procedural rules and regulations promulgated by the Secretary pursuant to 42 U.S.C. § 405(a), in order to determine if those rules and regulations are valid as applied to the particular cases before the court. 42 U.S.C. § 405(g). It has been well established, of course, that such regulations must be upheld if they are "reasonably related" to the purposes of the enabling legislation. *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1972); *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 280–281, 89 S.Ct. 518, 525–526, 21 L.Ed.2d 474 (1969). *See also Cheers v. Secretary of Health, Education, and Welfare*, 610 F.2d 463, 466 (7th Cir.1979), *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980).

After a careful consideration of the entire record, as well as the briefs submitted by the parties, this court is compelled to find that the Secretary's factual conclusions were not based upon substantial evidence. Further, this court also finds that the Secretary has promulgated an invalid procedural regulation in her five-step formula for the evaluation of disability claims. On both of these grounds, this court will order the ALJ's decision vacated and plaintiff's case remanded to the Secretary for further proceedings. A discussion of the reasons underlying these conclusions now follows, focusing first upon the Secretary's erroneous factual determinations.

■ In support of his claim for disability benefits, Mr. Baeder submitted as evidence several medical reports and opinions, as well as his testimony to the effect that he was precluded from performing his former job or *any* sort of substantial gainful activity. (Court Transcript, pp. 87–104, 20–36.) No evidence was offered by the Secretary to counter plaintiff's evidence. In finding the plaintiff to be "not disabled," the ALJ dismissed part of plaintiff's evidence and simply did not discuss the rest. For example, despite the opinion of plaintiff's physician, Dr. Frank D. Brigio, that plaintiff was "totally disabled" because of his worsening respiratory impairment, the ALJ decided that Mr. Baeder's physical impairments were not very serious or extensive. The ALJ came to the conclusion by claiming that Dr. Brigio's statements regarding the plaintiff's physical condition were not supported by "clinical evidence." (*Id.*, p. 11.) However, the ALJ's claim in this instance is simply *false*. The record shows that Dr. Brigio's most recent diagnosis of Mr. Baeder (dated March 10, 1983) was submitted along with 15 pages of detailed pulmonary function studies done at the Bridgeton Hospital in Bridgeton, New Jersey, on March 1, 1983. (*Id.*, pp. 89–104.) The ALJ pointed to no other source of evidence to refute the professional opinions and clinical tests submitted by Mr. Baeder's physician but, rather, dismissed this evidence for no legitimate reason.

■ Under the law, a treating physician's opinion cannot be rejected unless the ALJ refers to some other medical evidence contradicting it. *Rossi, supra*, at 58. The ALJ's only other statement in support of his rejection of plaintiff's evidence was that "there is no evidence of recurrent infection or pulmonary insufficiency or a combination of these factors." (Court Transcript, p. 11.) On its face, such an observation cannot be interpreted as anything but the ALJ's own "medical" opinion. It is well established, however, that such "medical" judgments by an ALJ contrary to professional medical opinion are simply invalid. *See, e.g., Smith v. Schweiker*, 671 F.2d 789, 793 (3d Cir.1982).

Plaintiff also submitted as evidence a disability statement which he apparently had sent to Aetna Life Insurance Company in support of his claim to be "totally disabled from any gainful employment." (Court Transcript, p. 87.) This document, signed by Dr. Brigio, states that Mr. Baeder's prognosis is poor, such that he will be prevented from engaging in any work for the remainder of his life. (*Id.*) The ALJ did not even mention this report in his decision. Neither did the ALJ refer to plaintiff's Disability Income Exclusion (IRS Form 2440), also submitted as evidence. (*Id.*, p. 88.)

▮▮▮ The ALJ also said virtually nothing about plaintiff's sworn testimony, except to summarize it briefly. But since the ALJ apparently found such testimony to be incredible, the ALJ had an obligation under the law to explain the grounds for such a finding. *See, e.g., Cotter v. Harris*, 642 F.2d 700, 704–7 (3d Cir.1981). Moreover, when a claimant has a work record like that of Mr. Baeder—approximately thirty years of continuous work with the same employer—his testimony as to his capabilities is entitled to substantial credibility. *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir.1979). The only other comment by the ALJ regarding the hearing itself was his observation that Mr. Baeder "did not appear to be in pain or discomfort." (Court Transcript, p. 11.) However, while the ALJ is empowered to evaluate the credibility of witnesses, *see, e.g., Smith v. Califano*, 637 F.2d 968, 969 (3d Cir.1981), this court cannot responsibly determine that the ALJ's rejection of plaintiff's subjective testimony was based upon substantial evidence when the ALJ completely failed to explain the reasons for such a rejection. *Van Horn v. Schweiker*, 717 F.2d 871, 873–4 (3d Cir.1983). Furthermore, bare observations by the ALJ regarding a plaintiff's "healthy appearance" simply do not constitute substantial evidence of non-disability, nor are such observations sufficient in themselves to discredit a plaintiff's

sworn testimony. *See, e.g., Lewis v. Califano*, 616 F.2d 73, 76–7 (3d Cir.1980).

▮▮▮ In addition to the above, this court has found some notable discrepancies in the plaintiff's evidence which the ALJ ought to address and resolve upon remand.

In the first place, the record contains a document entitled "Report of Telephone Contact," dated November 29, 1982, in which the plaintiff's physician (Dr. Brigio) apparently *downplays* the severity of several of the plaintiff's physical impairments. (Court Transcript, p. 85.) If the content of this document is veridical, then the *other* opinions of Dr. Brigio, which continually stress the plaintiff's total physical incapacity, might become questionable. On the other hand, this particular document may be misleading, since it is written in rather general and somewhat vague terms, and since the signature of Dr. Brigio which appears on it does not appear to be authentic (i.e., when compared to the consistently similar signatures of Dr. Brigio on three other documents in the record). In any event, on remand the ALJ is directed to clear up this matter and to determine precisely Dr. Brigio's medical prognosis of the plaintiff's health. The ALJ did not discuss this document at all in his decision. However, even if the ALJ *did* use this document to discredit Dr. Brigio's other reports, it must be noted that Dr. Brigio's contention that Mr. Baeder's *primary* health problem was his worsening pulmonary disease is not mentioned in the Telephone Contact. Hence, even at worst, this document may not reveal any inconsistency in plaintiff's evidence that is significant enough to damage his claim of disability.

In the second place, the clinical data submitted by Dr. Brigio has not yet received a *formal* diagnosis. That is, in his letter of March 10, 1983, Dr. Brigio states that the results of the pulmonary function tests have not been interpreted by the appropriate physician. (*Id.*, p. 89.) In Dr. Brigio's own opinion, the tests show that plaintiff's

pulmonary condition is "grossly abnormal," revealing a "significant pulmonic obstructive disease." (*Id.*) Although Dr. Brigio's interpretation of this data may in fact be accurate, the fact that he qualifies his opinion by referring to the requisite interpretation of another physician demonstrates that his opinion may be open to some doubt. Upon remand, an appropriate interpretation of this important evidence ought to be secured, as these facts are purportedly demonstrative of Mr. Baeder's most troublesome health problem. Again, the ALJ failed to discuss this issue, and this court finds that the ALJ's decision cannot be reasonably supported without such supplementary clarification.

The ALJ is directed, therefore, not only to provide specific reasons for his rejection of any probative evidence (including the plaintiff's testimony), but to make the additional findings necessary to clear up the doubts about plaintiff's case which might be raised by the two items just discussed. The ALJ should be aware that these directives only result from a restatement of the obligations imposed by the law and, as such, should have been recognized and respected by the ALJ in the first place. *See, e.g., Dobrowolsky, supra.*

 It appears to this court that the plaintiff has, indeed, met his burden of showing a *prima facie* case of disability. *Rossi, supra*, at 57. However, it is not the function of this court to consider the question of plaintiff's disability *de novo*. *See, e.g., Rivera v. Harris*, 623 F.2d 212, 216 (2d Cir.1980). Such a consideration, subject to the specific directions outlined in this opinion, is left to the Secretary on remand. Alternatively, the responsibility of this court to review rulings by the Secretary on disability matters does not end here. The regulations that have been used by the Secretary in the present case, and which will probably be used by the Secretary on remand, are also subject to this court's review. 42 U.S.C. § 405(g). The issue of the validity of one of the Secretary's regulations concerning the evaluation of disability claims will therefore be addressed.

### 4. *Analysis of the Secretary's Procedural Regulations.*

The plaintiff has not only challenged the Secretary's factual determinations in this case but argues that the Secretary has also committed legal error by promulgating (and applying in the present case) a regulation that is fundamentally inconsistent with the Act. It is the plaintiff's position that 20 C.F.R. 404.1520(c), which allows the Secretary to deny an application for benefits without any detailed examination of the claimant's vocational characteristics, exceeds the authority granted to the Secretary by the Act. Thus, plaintiff contends that 1520(c) is an invalid regulation under the applicable law. In response to this contention, the defendant in this case argues that 1520(c) is consistent with the Act and is therefore a valid procedural regulation.

 The regulation at issue here was the instrument utilized by the ALJ to deny disability benefits to Mr. Baeder. It is possible, on the remand of this case to the Secretary, that the same regulation could be used to reach exactly the same result (although that result would have to be much more forcefully and clearly supported, as the discussion above has pointed out). Plaintiff therefore has a personal stake in the outcome of a judicial consideration of the validity of this regulation. A favorable decision on this issue by this court would effectively remove one of the barriers which plaintiff must overcome in order to obtain disability benefits. In light of such facts, then, it is clear that Mr. Baeder has the requisite standing to raise this particular legal claim. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471–6, 102 S.Ct. 752, 757–61, 70 L.Ed.2d 700 (1982) (for

standing to be recognized in federal court, party must show that s/he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, which is likely to be redressed by a favorable decision).

This court also takes notice of the fact that there has currently been considerable judicial attention given to the question of the validity of 1520(c). *See, e.g., Gist v. Secretary of Health and Human Services,* 736 F.2d 352 (6th Cir.1984) (validity of 1520(c) upheld); *Smith v. Heckler,* Civ. No. S–83–1609 (E.D.Ca. June 6, 1984) (preliminary injunction granted restraining Secretary from applying all rulings and regulations which deny benefits on the basis of "non-severe" impairments); *Hundrieser v. Heckler,* 582 F.Supp. 1231 (E.D.Ill.1984) (Secretary's requirement of "severity" under 1520(c) places burden on Secretary to show that claimant's impairment is presumptively non-disabling). Because of the importance of this challenge, and because of the plaintiff's direct interest in this particular question upon the remand of his case, this court has chosen to address this issue. For the reasons hereinafter to be outlined, this court finds that 20 C.F.R. 404.1520(c) has no rational relation to the purposes of the Act, that it exceeds the statutory authority delegated by Congress to the Secretary, and so, that it is invalid. *See* 42 U.S.C. 405(a); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (judicial review of administrative regulations must determine whether Secretary exceeded authority, whether regulations were arbitrary, capricious, abusive of discretion or illegal, and whether necessary procedural requirements were followed). Further, since there has been ample evidence at the court's disposal for a careful and complete consideration of this issue, including several rounds of reply briefing by the parties, there is no need for this court to hear oral arguments from the parties; plaintiff's request for oral argument on this issue is therefore denied.

A.

As mentioned above, in the evaluation of disability claims, the Secretary now follows a sequential, five-step procedure, described in 20 C.F.R. 404.1520(a) to (f) as follows:

*§ 404.1520 Evaluation of disability in general.*

(a) *Steps in evaluating disability.* We consider all material facts to determine whether you are disabled. If you are doing substantial gainful activity, we will determine that you are not disabled. If you are not doing substantial gainful activity, we will first consider your physical or mental impairment(s). Your impairment must be severe and meet the duration requirement before we can find you to be disabled. We follow a set order to determine whether you are disabled. We review any current work activity, the severity of your impairment(s), your residual functional capacity and your age, education, and work experience. If we can find that you are disabled or not disabled at any point in the review, we do not review further.

(b) *If you are working.* If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or your age, education, and work experience.

(c) *You must have a severe impairment.* If you do not have any impairment(s) which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience. However, it is possible for you to have a period of disability for a time in the past even though you do not now have a severe impairment.

(d) *When your impairment meets or equals a listed impairment in Appendix 1.* If you have an impairment which meets the duration requirement and is

listed in Appendix 1, or we determine that the impairment is equal to one of the listed impairments, we will find you disabled without considering your age, education, and work experience.

(e) *Your impairment must prevent you from doing past relevant work.* If we cannot make a decision based on your current work activity or on medical facts alone, and you have a severe impairment, we then review your residual functional capacity and the physical and mental demands of the work you have done in the past. If you can still do this kind of work, we will find that you are not disabled.

(f) *Your impairment must prevent you from doing any other work.* (1) If you cannot do any work you have done in the past because you have a severe impairment, we will consider your residual functional capacity and your age, education, and past work experience to see if you can do other work. If you cannot, we will find you disabled. (2) If you have only a marginal education, and long work experience (i.e., 35 years or more) where you only did arduous unskilled physical labor, and you can no longer do this kind of work, we use a different rule (*see* § 404.1562).

At the second step of this process, the Secretary apparently determines whether or not the claimant's impairment is "severe" based upon medical considerations alone. If the Secretary finds that the claimant's impairment is not "severe," a summary determination of non-disability is made without further consideration of the claimant's particular vocational characteristics.

The Secretary's apparent rationale for this procedure is that certain impairments are simply and obviously too slight to be vocationally significant and, so, would supposedly *never* preclude any claimant from performing *some* sort of substantial gainful activity. *See, e.g.,* defendant's "Reply Memorandum of Law," filed May 30, 1984, p. 8; 45 Fed.Reg. 55,574 (August 20, 1980). Given such an assumption, it is purportedly a foregone conclusion that any evaluation of a claimant, beyond the 1520(c) finding that claimant's impairment is "not severe," will *always* result in a determination of "not disabled." In the Secretary's view, it is simply more efficient that such "inevitable" findings be made at an early stage in the evaluation process rather than at a later stage, after further unnecessary proceedings. Hence, 1520(c) is meant to be a short-cut procedure on the Secretary's part, designed to save the administrative time and effort that would be required to process claims which, supposedly, are predictably groundless.

The primary reason that 1520(c) has thus far been characterized as problematic, however, is that its promulgation and use seem to ignore Congress' specific inclusion of both medical *and* vocational components into the Act's definition of "disability." Basically, the Act disjunctively describes "disability" as the incapacity to perform either past work or any type of other work due to a medically determinable impairment. The pertinent parts of the Act, 42 U.S.C. § 423(d)(1)(A), (2)(A) and (3), define the term "disability" in the following ways:

> (A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months;
> (2) For purposes of paragraph (1)(A)—
> (A) an individual ... shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regard-

less of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

(3) For purposes of this subsection, a "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

The Secretary has apparently interpreted these words to mean that the severity of a claimant's impairment is an independent threshold criterion which must be satisfied in the process of obtaining disability benefits. On such an interpretation, the severity test becomes a separate and distinct obstacle whereby a claimant can seemingly be denied benefits on medical considerations alone.

It has been argued, alternatively, that the specific words used by Congress make evident the idea that medical factors were intended to be considered only in combination with vocational factors, and that the "severity" of an impairment was intended to be understood only in relation to such vocational facts. As one federal court recently observed in regard to section (2)(A):

> This provision specifies the level of severity only by reference to an individual's ability to do past work, or considering vocational factors of age, education and experience, other work. Nothing in that definition suggests that the severity of a claimant's impairment is an independent variable that alone can serve as a basis for a finding of not disabled.

*Smith v. Heckler, supra,* slip op. at 9–10. *See also Hundrieser, supra,* at 1236–1237.

Furthermore, as the *Hundrieser* court convincingly demonstrated, a detailed examination of the legislative history of the Act also provides compelling support for this interpretation of the Act's specific requirements for disability determinations. *Id.,* at 1238–40. The *Hundrieser* court concluded that the Secretary's promulgation and use of the 1520(c) summary procedure to deny benefits to claimants when their physical impairments were deemed not severe "boldly contravenes the language and structure of 42 U.S.C. § 423(d)(a)(A)." *Id.,* at 1236.

The basic controversy over 1520(c), then, concerns whether or not the Secretary's use of a separate requirement of "severity" runs counter to the congressional intent to assure that disability determinations include both medical *and* vocational factors. While this court has found the arguments put forth by both the *Smith* and *Hundrieser* courts to be enlightening, it must nevertheless be noted, in fairness to the Secretary, that the use of 1520(c) need *not* be interpreted as a flat rejection of the congressional directive to consider both medical and vocational factors in the determination of disability. When the Secretary uses 1520(c) to deny benefits to a claimant with a "non-severe" impairment, the Secretary can *still* be seen as giving consideration to a claimant's vocational characteristics, albeit in a generalized and implicit way. That is, the Secretary's use of 1520(c) is based upon the assumption that there are many physical impairments which are so minor, and which have such minimal effects upon an individual's vocational abilities, that no person suffering from such impairments could be disabled from performing all work, *irrespective* of age, education and work experience. The administrative history of 1520(c) vividly supports this reading of its intended meaning. *See, e.g., Brady v. Heckler,* 724 F.2d 914, 919–920 (11th Cir.1984) (*per curiam*); *Chico v. Schweiker,* 710 F.2d 947, 954, n. 10 (2d Cir.1983); *Trafton v. Heckler,* 575 F.Supp. 742, 745 (D.Me.1983).

Upon such a view of 1520(c), the Secretary can justifiably claim to have *included* a vocational component in any determination of nondisability under 1520(c), viz., the implicit administrative recognition that there are *always* jobs in significant numbers in the national economy for a person with non-severe impairments, no matter what such a person's *specific* vocational capacities are. *See* the "Policy Statement" in the Secretary's Ruling # 82–55, entitled "Medical Impairments That Are Not Severe" (SSR, 1982). Such an assumption allows the Secretary to predict that no claimant who was *denied* benefits under 1520(c) could ultimately have been found to *deserve* benefits if the evaluation process had proceeded through all five steps. Therefore, although the use of 1520(c) *appears* to disregard the legislative directive to the Secretary to consider both medical and vocational factors in disability determinations, there is a way of interpreting 1520(c) that clearly avoids the problem. Similarly, although the use of 1520(c) *appears* to allow denials of benefits on medical considerations alone, there is an interpretation of 1520(c) that allows for the implicit inclusion of a vocational consideration as well.

For these reasons, this court is not persuaded by the argument put forth by the *Hundrieser* court. However, even though this court finds the rationale in *Hundrieser* to be misguided, the conclusion that 1520(c) is inconsistent with the Act can be shown to follow upon other grounds.

### B.

■ As discussed above, there is some plausibility in saying that the Secretary's use of 1520(c) contains an *implicit* vocational consideration and so is consistent with congressional intentions. But the key to such an interpretation of 1520(c) is the factual assumption that, for persons with certain impairments, there will always be jobs in the national economy which such persons can perform. The question is therefore whether or not this assumption is warranted. Upon consideration of the present case, as well as several hypothetical cases, it can be clearly demonstrated that this assumption is erroneous.

Using the situation of the plaintiff in this case as an example, it is altogether possible that, on remand, the Secretary will once again find that plaintiff's impairments are "not severe," and, as a result, use the 1520(c) summary procedure to deny the plaintiff's claim for benefits. Were the Secretary to decide Mr. Baeder's case in such a way, the Secretary would implicitly be saying that no person with Mr. Baeder's impairments would be incapacitated from performing work which exists in substantial quantities in the national economy. In the alternative, the Secretary's use of 1520(c) in Mr. Baeder's case would also entail the implicit *prediction* that, were the Secretary to continue the evaluation process in Mr. Baeder's case through all five steps, the inevitable result would be that Mr. Baeder would be found to have the capacity to perform jobs which exist in the national economy in substantial numbers and, so, would be judged "not disabled." Such a result would obtain even if Mr. Baeder could have shown that his impairments (while not severe) precluded him from returning to his past work.

Suppose, however, that in a fit of administrative generosity, the Secretary decided to bypass the 1520(c) step on the remand of Mr. Baeder's case and to scrutinize his claim for disability benefits more fully. Also suppose that, due to a sudden increase in the number of disability claims which the Secretary was forced to handle, Mr. Baeder's hearing on remand was held in September of 1985, when Mr. Baeder reaches age 55. After presenting evidence of his "non-severe" physical impairments (viz., chest pain, pulmonary disease, arthritis, etc.), Mr. Baeder would then attempt to show that those impairments *precluded* his

return to his former job as an operator of a bottle machine. Such a job is characterized as work of a "medium" physical exertion level and of a semi-skilled nature. *See* 20 C.F.R. 404.1567(c). Suppose now that Mr. Baeder's evidentiary support for such a showing was clear and uncontroverted, and that the Secretary was therefore convinced that Mr. Baeder could not return to his former job with his present impairments, even though such impairments were admittedly "non-severe."[1] Under the law, Mr. Baeder would have made a *prima facie* case of disability and would have thereby shifted the burden to the Secretary to show that he could still do other work. *See, e.g., Rossi, supra.*

If the Secretary's assumption (*see supra*) were correct, then the Secretary could show at this point that there were other jobs in the national economy that Mr. Baeder could perform. The Secretary would generally address this burden by referring to Appendix 2 of 20 C.F.R., viz., the Secretary's Medical-Vocational Guidelines (also known as "the grid"). These guidelines were developed by the Secretary for reasons of efficiency and consistency and reflect an "administrative notice ... of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels ...." 20 C.F.R. Appendix 2, Sec. 200.00(b). The grid therefore represents a series of factual findings by the Secretary reflecting the actual quantities of substantial gainful activity in the national economy for persons of various ages, educational levels, and vocational backgrounds. In its classification of Mr. Baeder, the Secretary would find: (1) he is of "advanced age," (2) he is a high school graduate, (3) his education does not provide for direct entry into skilled work, (4) his work experience has been in semi-skilled labor, and (5) his work skills are not transferable. Since the Secretary has accepted

the fact that Mr. Baeder cannot return to his old "medium level" job, due to his "non-severe" impairments, the Secretary would refer to either Table No. 2 ("Light Work") or Table No. 1 ("Sedentary Work"). The applicable grid rules in Mr. Baeder's case would be 202.06 in Table No. 2 and/or 201.06 in Table No. 1. However, each of these rules mandates a finding of "disabled," *a result that is directly at odds with the Secretary's assumption and prediction.*

Consequently, if the foregoing suppositions regarding the possible future disposition of Mr. Baeder's case are accepted (and none of them seem to be implausible or unreasonable), then the Secretary's use of the 1520(c) provision would *deny* benefits to Mr. Baeder when further inquiry into his specific and individualized vocational situation would have resulted in a *grant* of benefits. By the Secretary's own factual findings, as represented in the grid, there is not a substantial number of jobs in the national economy which Mr. Baeder would have the capacity to perform, even if Mr. Baeder's impairments were not "severe." Hence, the assumption that there are *always* such jobs for persons with non-severe impairments is simply false. Further, the prediction implicitly made by the Secretary that, if full-scale vocational evaluations were done in the case of claimants with only "non-severe" impairments, findings of "not disabled" would always result, is also false.

The single example of Mr. Baeder's hypothetical remanded case is enough to undermine the Secretary's justification for the 1520(c) summary procedure, simply because it serves as a counter-example to the Secretary's assumption and prediction. *See Smith v. Heckler, supra,* slip op. at 12–13 (similar example used). However, it is clear that Mr. Baeder's case is only representative of an entire *class* of claimants.

---

1. The Secretary herself admits that an impairment which can preclude an individual from doing his/her previous work can still be considered "non severe." *See* "The Sequential Evaluation Process," SSR 82–56; *Smith v. Heckler, supra,* at 8–9, 12.

This class encompasses all persons with "non-severe" impairments which prevent them from returning to their old jobs, but whose age, education and vocational characteristics (when considered by the Secretary) would result in decisions of "disabled" when the grid is utilized in their cases.

Looking at the Secretary's grid itself, there are 17 distinct sub-classes of such persons of various ages and educational/vocational backgrounds who would be considered "disabled" *if* their disability claims had not been preempted by 1520(c) and *if* they could show that their impairments precluded them from returning to their previous work. The same results would obtain for all persons whose specific circumstances would make the use of the grid inappropriate but where a complete disability evaluation would result in a ruling of "disabled." *See, e.g.,* 20 C.F.R. Appendix 2, Sec. 200.00(a), (b), (d), (e) (certain individualized considerations preclude Secretary's use of the grid in making disability determinations). Hence, the Secretary's threshold requirement of a "severe impairment" for disability functions to *deny* benefits to an entire class of persons who could demonstrate, through individualized examinations of their vocational characteristics (either by consulting the grid or by obtaining other vocational data), that their impairments (while not "severe") precluded them from working at *any* job. And there is simply no doubt whatever that such persons were intended by Congress to receive disability benefits under the Act, since such claimants would have satisfied *both* the requirement that they could not return to their former jobs, *and* that they could not engage in any other type of substantial gainful activity. 42 U.S.C. § 423(d)(1)(A), (2)(A). This result, then, plainly demonstrates precisely *why* 1520(c) is inconsistent with the Act.

While it is true that, in many cases, the severity of a claimant's impairment *is* so slight that an eventual finding of non-disability is inevitable, the Secretary clearly has no authority to construct regulations designed to exploit such cases for efficiency reasons when those regulations also deny benefits to those defined by Congress as disabled. *See* 42 U.S.C. 405(2) (Secretary has authority to make only such regulations as are consistent with the Act). Since it is the Act which empowers the Secretary to make regulations which implement the Act's provisions, it is clear that such regulations cannot also be used to undermine the meaning and purpose of the Act itself. *See, e.g., Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980) (administrative agency's interpretation of a statute cannot supersede the language chosen by Congress).

Therefore, even if the Secretary's promulgation and use of 1520(c) is interpreted to contain a generalized or implicit vocational component, this component is a demonstrably *false* assumption which can result in the denial of benefits to whole groups of persons who clearly meet the legislative definition of disability. Without this assumption, there is simply no way to determine whether a particular claimant's impairment *would* lead to an eventual finding of disability/non-disability without actually *proceeding* through the rest of the steps in the Secretary's evaluation procedure. As an administrative short-cut, then, 1520(c) fails. While it may work adequately in many cases, it will yield demonstrably illegal and erroneous results in other cases. Obviously, a regulation is not rationally related to the statute under which it is promulgated when that regulation is inconsistent with that statute. Since it has been shown that 20 C.F.R. 404.1520(c) is out of harmony with the Act, this court is led to the inescapable conclusion that this regulation is invalid. *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977); *Citizens to Preserve Overton Park, Inc., supra; Mourning, supra; Thorpe, supra.*

## C.

While the invalidation of one of the Secretary's regulations by this court might ordinarily be considered somewhat radical and disruptive of the agency's administrative procedures, there are several factors in this particular instance that substantially mitigate any such effects of this ruling.

In the first place, the Secretary's stated purpose in proposing the five-step evaluation procedure was "not to increase nor decrease the allowance/denial ratio" in disability cases, 43 Fed.Reg. 9295 (March 7, 1978), but was to improve "program efficiency ... by limiting the number of cases in which it would be necessary to follow the vocational evaluations sequence ...." 45 Fed.Reg. 55,574 (August 20, 1980). The apparently unforeseen effect of 1520(c) to deprive benefits to those who are entitled to such benefits by statute, then, is also contrary to the Secretary's *own* intentions. Further, as of late 1981, the Secretary was apparently studying the feasibility of revising 1520(c) anyway. *See Lofton v. Schweiker*, 653 F.2d 215, 217–8, n. 1 (5th Cir.1981). Of course, it is clear that the use of 1520(c) was never a *necessary* step in disability evaluations, since its function would always be subsumed in steps four and five, under 1520(e) and (f). In addition, the Secretary has even admitted that, in "most cases that involve an impairment that is not severe, the vocational evaluation guides can be applied as efficiently as can the nonsevere impairment principle." *Id.* Hence, even if 1520(c) did *not* bring about anomalous and harmful results in certain classes of cases, its usefulness as an efficiency device was apparently negligible.

In the second place, the absence of 1520(c) from the disability evaluation procedure will allow the Secretary to make disability determinations on a more *individualized* basis, a result that the Act itself contemplates and encourages. *See* 42 U.S.C. § 423(d)(2)(A) (specifying considera-

tion of each individual's condition); 42 U.S.C. § 405(b) (1976 ed., Supp. V) (disability determination to be based on evidence adduced at hearing). The need for such individualized assessments of the particular vocational abilities of claimants was also of central importance to the Supreme Court in *Heckler v. Campbell*, 461 U.S. 458, at 467–68, 103 S.Ct. 1952, at 1957–1958, 76 L.Ed.2d 66 (1983), wherein the Court upheld the validity of the Secretary's medical-vocational guidelines. The Court strongly implied that, unlike a determination of the types and numbers of jobs that exist in the national economy, the evaluation of a person's vocational capacities was "unique to each claimant." *Id.*, at 468, 103 S.Ct. at 1958. Hence, the invalidation of 1520(c) is precisely in harmony with the Court's recent treatment of both the Act itself as well as the Secretary's power to promulgate procedural regulations pursuant to the Act.

Finally, the invalidation of 1520(c) will help to prevent the Secretary's administrators from making findings of "not disabled" when a claimant's impairments *appear to such administrators personally* to be "non-severe." For example, in one case recently before this court, an ALJ decided that a claimant was "not disabled" even *after* expert vocational testimony supported a claim for disability from *all* work. The ALJ simply used the 1520(c) provision to circumvent the vocational evidence by holding that the claimant's impairments were (after all) "non-severe," and so that the claimant was not entitled to benefits. *See Conley v. Heckler*, Civ. No. 83–3935 (D.N.J. September 10, 1984). In light of the increasing number of disability cases in which a finding of "non-severe" forms the basis of a denial or termination of benefits (as noted in *Trafton, supra*, at 746), the possibilities for the abuse of 1520(c) are apparent. Although 1520(c) was not intended by the Secretary to change illegitimately the allowance/denial ratio for disability benefits, the discussion above dem-

onstrates that 1520(c) *can* be used for such a purpose. Hence, the elimination of this second step in the Secretary's evaluation procedure will contribute to the overall integrity of the agency's proceedings as they are practiced in fact.

5. *Conclusion.*

For all of the aforementioned reasons, the decision of the ALJ will be vacated and this case remanded. The Secretary is specifically directed on remand to conduct plaintiff's disability evaluation without reference to procedural regulation 20 C.F.R. 404.1520(c), and to conduct all further proceedings in this case and all other cases in a manner consistent with this opinion. The accompanying order will be entered.