AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, et al.

v.

**Ronald W. REAGAN, et al.**

**Civ. A. No. 84–4476.**

United States District Court, E.D. Pennsylvania.

May 7, 1985.

Lee Boothby, Berrien Springs, Mich., Earl W. Trent, Jr., Valley Forge, Pa., for plaintiffs.

Alexander Ewing, Jr., U.S. Atty., Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

On January 10, 1984, the United States Department of State issued the following formal announcement:

"The United States of America and the Holy See, in the desire to further promote the existing mutual friendly relations, have decided by common agreement to establish diplomatic relations between them at the level of embassy on the part of the United States of America, and Nunciature on the part of the Holy See, as of today, January 10, 1984."

President Regan announced that he would nominate the Honorable William A. Wilson, who had been serving as his personal representative to the Vatican, as United States Ambassador to the Vatican; Mr. Wilson's nomination was confirmed by the Senate on March 7, 1984.

Plaintiffs, a group of 20 religious organizations and 12 of the officials of these organizations, together with some 71 individual members of the clery of various denominations, have brought this lawsuit challenging the adoption and implementation of these arrangements, on a variety of constitutional grounds. The defendants have filed a Motion to Dismiss.

Plaintiffs assert four categories of claims, which may be summarized as follows:

1. By confirming the appointment of Ambassador Wilson and by providing funds to support his activities, Congress has violated the First Amendment because the arrangement (a) establishes a formal official relationship with a church, (b) amounts to a preference of one church over all other churches, (c) provides special benefits to one church to the detriment of all others, (d) produces excessive entanglement of the govern-

ment in church affairs and vice-versa, and (e) creates religious divisiveness.

2. The President has exceeded his Article II powers, since the Holy See is a church, not a state; moreover, the President's actions contravene the First Amendment, for the reasons mentioned above.

3. The arrangement violates the Equal Protection Clause of the Fifth Amendment.

4. The defendants have violated the Constitution in various specific ways, including (a) supporting the Catholic Church, to the detriment of all others, (b) spending tax dollars for the benefit of the Catholic Church and its prelates, (c) supporting the Catholic Church in its efforts to counteract and nullify the influence of foreign missionaries allied with other churches, and (d) cooperating with the Catholic Church in investigating other United States religious organizations. The defendants disagree with plaintiffs' constitutional arguments, but assert, preliminarily, that plaintiffs lack standing to bring this lawsuit, and that the court lacks subject-matter jurisdiction over these "political questions".

## I. BACKGROUND

At the time of the American Revolution, and during the first several decades of our nation's history, what we now think of as the Vatican or the Holy See included the Papal States, an area of some 16,000 square miles with a population in excess of 3 million, whose temporal as well as spiritual ruler was the Pope. Amicable commercial relationships between the Papal States and this country were established shortly after the end of the Revolutionary War. A United States consul was appointed in 1797; he and his successors apparently derived their financial support from consular fees.

In 1847, at the request of President Polk, Congress authorized the opening of formal diplomatic relations with the Papal States, and provided funding for a chargé d'affaires. The first such official was appointed, with the advice and consent of the Senate, in 1848.

In 1867, while Congress was considering the diplomatic and consular appropriation bill, questions were raised concerning whether the Vatican permitted Protestant church services to be conducted at the American Embassy in Rome; whereupon, Congress duly enacted a provision to the effect that "no money hereby or otherwise appropriated shall be paid for the support of an American legation at Rome, from and after the 30th day of June, 1867." Attempts to restore funding proved unsuccessful.

In 1870, the Italian government annexed the Papal States, and the status of the Vatican/Holy See/Roman Catholic Church as a territorial entity remained a matter of dispute and uncertainty until February 11, 1929, when the Lateran Treaty between the Holy See and the Italian government became effective. This treaty created the "State of the City of the Vatican", and, in return, the Holy See renounced its claims to the territory previously encompassed in the Papal States. Vatican City includes about 108 acres (approximately one-sixth of a square mile) of territory, with a permanent population of approximately 1,000. It is the world headquarters of the Roman Catholic Church.

Beginning in 1939, presidents of the United States have exchanged personal representatives with the Vatican. In 1951, President Truman sought to appoint an ambassador to the Holy See, but the proposal generated controversy, and was withdrawn in 1952. In 1970, President Nixon appointed Henry Cabot Lodge as his personal representative. As in the case of his predecessors, Mr. Lodge's appointment did not require senatorial approval or congressional funding. Every president since then has appointed a personal representative to the Vatican. Mr. Wilson, whose appointment as ambassador is challenged in the present litigation, was serving as President Reagan's personal representative from 1981 until his appointment as ambassador.

In order to clear the way for the exchange of ambassadors, Congress had enacted P.L. No. 98–164, § 134, 97 Stat. 1029, on November 22, 1983, repealing the restriction against appropriations contained in the 1867 Act discussed previously.

Concomitantly with Ambassador Wilson's appointment, the Vatican sent a representative of equivalent rank (a Pro-Nuncio) to this country.

## II. STANDING

The Constitution imposes limitations upon the judicial branch, as well as the other two branches. A court may exercise judicial power only at the instance of a litigant who has suffered, or is threatened with, legal injury. Such a litigant is said to have "standing" to seek judicial intervention. While judicial pronouncements on the subject of standing have not always been clear and consistent, recent decisions of the Supreme Court have removed much of the uncertainty surrounding the development of standing doctrine, and provide clear answers to the questions of standing involved in the present case.

In combination, the decisions in *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1981), *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), *Schlesinger v. Reservist Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), and *U.S. v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) establish the following principles: (1) a taxpayer, as such, may have standing only to challenge actions by Congress in the exercise of its taxing and spending power under Article I, § 8 of the Constitution; (2) a litigant has no standing to complain about actual or threatened violations of the Constitution, by any branch of the government, unless such violation directly injures that litigant, as distinguished from the public at large; and (3) there is no relaxation of standing requirements merely because violations of the First Amendment are alleged. In short, a citizen does not have standing to litigate alleged violations of the Establishment Clause merely because of an interest in achieving a just society in which church-state separationist values are preserved. It was that precise issue which divided the Court in *Valley Forge Christian College, supra;* needless to say, this court is obliged to follow the majority opinion in that case.

Plaintiffs have tried valiantly to identify particularized injury-in-fact in this case, but the effort has failed. Specifically, they claim: (1) that they are being denied equal access to the Executive Branch of government, in that the unique, continuing relationships resulting from the ambassadorial appointment will not be available to the plaintiffs or their organizations. (2) The spiritual and moral teachings of the Catholic faith, plaintiffs assert, will be thrust into the public limelight and the political arena in a manner not available to other religions. (3) The Catholic Church will be better able to compete in the religious market-place, with corresponding loss of membership and revenue for other religious denominations, because of the actual or symbolic preference Mr. Wilson's appointment connotes. (4) The Papal Nuncio and other Vatican representatives are clergymen; they are being granted diplomatic privileges and immunities not available to the clery of other faiths. (5) Plaintiffs' religious beliefs and religious institutions are stigmatized because the formalization of diplomatic relations with the Vatican makes it appear that the Catholic Church is more important than other denominations. (6) The establishment of diplomatic relations with the Vatican will have an impact on government policies, and plaintiffs and members of their congregations will be subjected to subtle, indirect pressures to conform to such government policies, even though such policies may be contrary to their spiritual and moral beliefs and practices. And (7) the Catholic plaintiffs' (there are several) "free-exercise" rights are being invaded, in view of the potential for

governmental intrusion into the internal affairs of the Catholic Church.

■ These alleged injuries, in my view, amount to nothing more than a statement of some of the reasons why the separation of church and state is a good idea. These plaintiffs do not differ, in any significant respect, from the vast majority of Americans who support the principles of the First Amendment. But this, under the teaching of *Valley Forge Christian College, supra,* does not entitle them to litigate the alleged First Amendment violation. Persons who hold strong views on the subject of school prayer, for example, are not entitled to call upon the courts for relief unless they or their own children attend the schools in question and are directly affected by the practice. *Doremus v. Board of Education of Borough of Hawthorne,* 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952).

Plaintiffs do not allege that the actions now challenged have caused a decline in the membership or revenues of any of the plaintiffs' denominations or organizations, and any such assertion would be patently frivolous. Neither is there any allegation that the Catholic Church has been interfered with by our government, or that any of the plaintiffs or their organizations have been required to pursue objectionable policies or goals. All that is alleged is that plaintiffs believe that the challenged actions may create a climate in which these dire consequences will be more likely to occur. But that, quite obviously, does not amount to particularized injury-in-fact, under the authorities cited above.

I conclude that this action must be dismissed because plaintiffs lack standing to pursue it.

### III. POLITICAL QUESTION

In no area of governmental activity is judicial intervention less likely to be permissible than in the President's conduct of foreign policy.

"The very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the judiciary has neither aptitude, facilities or responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Chicago and Southern Airlines v. Waterman Steamship Co.,* 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948).

Every one of plaintiffs' contentions in this litigation is based upon the premise that "the Vatican" or the "Holy See", with which the exchange of ambassadors has occurred, is essentially a church rather than a state, or, at least, that it is a church-state whose churchly attributes far outweigh its secular attributes. The record provides considerable support for the proposition that the Vatican/Holy See views itself in that light. But this does not mean, of course, that the government of the United States is obliged to regard the Vatican/Holy See as primarily a church rather than a state. Whatever the correct analysis, the authority to conduct it rests with the Executive Branch, not this court.

"What government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government." *Guaranty Trust Co. v. U.S.,* 304 U.S. 126, 137, 58 S.Ct. 785, 791, 82 L.Ed. 1224 (1938).

Moreover,

"The authority of the political department is not limited, however, to the determination of the government to be recognized. The President is also empowered to determine the policy to govern the question of recognition. Objections to the President's determination of the government 'as well as to the underlying

policy' must be addressed to the political department." *U.S. v. Pink*, 315 U.S. 203, 207, 62 S.Ct. 552, 86 L.Ed. 796 (1942).

■ It is unnecessary to decide whether the Constitution would be violated were the President to establish formal diplomatic relations with a church *qua* church, and I express no view on that subject. It is enough, for present purposes, to express my firm conclusion that this court is not empowered to pass judgment on the accuracy of the President's characterization of the nature of the entity with which diplomatic relations are established.

## IV. THE AMENDED COMPLAINT

Plaintiffs filed their Complaint in this action on September 19, 1984. The defendants responded with a Motion to Dismiss, and plaintiffs were granted an extension of time for filing their response to the motion.

Although the original Complaint included class-action allegations, plaintiffs' counsel perceived that there had been inadequate compliance with this Court's Local Rules pertaining to class actions. Accordingly, on December 20, 1984, plaintiffs filed a motion for leave to amend their Complaint, so as to bring it into compliance with the local rule; at the same time, plaintiffs requested an extension of time for obtaining formal certification of the class action, until after the court had ruled on the pending motion to dismiss. Both applications were granted.

Plaintiffs' memorandum in opposition to the Motion to Dismiss (119 pages, plus numerous exhibits) was filed January 14, 1985. Reply memoranda, supplemental memoranda, etc., were filed thereafter, and oral argument was scheduled for March 15, 1985, at 9:30 a.m. Late in the afternoon of March 14, 1985, plaintiffs filed their "First Amended Complaint". In addition to the purely formal amendments the plaintiffs had originally proposed, this document makes numerous substantive changes in plaintiffs' allegations and claims. It is clear that plaintiffs had the right to file an amended complaint, without obtaining leave of court, since the defendants had moved to dismiss, rather than responding on the merits. On the other hand, after they obtained permission to file a specific amendment to the Complaint, and permitted their adversaries to proceed on the assumption that that was the only change contemplated, plaintiffs' eleventh-hour amendment falls outside the bounds of acceptable advocacy.

Although, as a result of the substantive changes in plaintiffs' pleadings, the briefs of all parties are slightly off-target in some respects, I have concluded that the First Amended Complaint does nothing to overcome the plaintiffs' lack of standing or the non-justiciability of the controversy. Since the Amended Complaint presumably reflects everything the plaintiffs can muster in response to the Motion to Dismiss, no useful purpose would be served in permitting further amendments.

## V. CONCLUSION

Plaintiffs' Complaint and plaintiffs' First Amended Complaint will be dismissed, with prejudice, on the grounds that (1) plaintiffs lack standing, and (2) the controversy is not justiciable.